WILLIAM D. MOTT, as Administrator, etc., et al., Respondents,    57  49
      v. ERVILLA RICHTMYER et al., Appellants.     150 146

The rule excluding parol evidence tending to explain, modify or contradict written instruments applies as well to subsequent as to prior or cotemporaneous oral declarations of the parties.

Three brothers, D., G. and A., were tenants in common of certain real estate. In view of a division, giving to D. his portion in severalty, G. and A. executed an instrument under seal, dated April 21, 1835, by which G. agreed that his share should remain with A.'s undivided, and he constituted A. his attorney, to take and receive his portion; A. to take charge of the two undivided shares and the "charge, direction, use and income of said estate" to belong to A., "his heirs, executors or administrators or assigns forever." As a consideration, A. agreed to give G. a home with him and to support him; G., in case of his marriage or of ill usage by A., reserved the right to have his portion set off and to resume control of it; G. agreed that he would not at any time revoke the power of attorney, save for one of the causes above mentioned. He also had the right to devise his estate as he chose. *Held*, that this instrument conveyed to A. an estate in fee, subject to be defeated by a resumption of the estate for one of the causes specified or by a devise, and that upon the death of G. intestate, A. having performed on his part, the latter would take under it an absolute title.

On the seventh of May, thereafter, A. and G. executed another instrument under seal, modifying the first; by it, a specified tract of land was agreed to be set off as G.'s share, and a sum of money (the amount to be determined by arbitrators), awarded to him to be paid by A. to make their shares equal, which sum was to remain in A.'s hands with G.'s share of the personal estate, and out of it A. to build farm buildings on said tract, if G. should serve upon him a written notice of his desire to seek a new home. *Held*, that this instrument did not work a re-conveyance by A., and that the former instrument remained in force, save as modified.

On the eleventh of May G. executed to A. a quitclaim deed of the tract so set off, to A., "his heirs and assigns forever, to have and to hold * * * in trust, for the purpose of securing" to G. a "good comfortable living and maintenance under contingencies of sickness, infirmities and old age." *Held*, that if the *habendum* clause was intended to cut down A.'s interest to an estate for life of G., it was repugnant to the premises of the deed and void; that no trust was created, such as is authorized by the Revised Statutes (1 R. S., 728, § 55); that the real estate in fee simple was conveyed to A., charged with or upon condition that he support G.; and that G. having been supported, upon his death, the land became A's., freed from any charge or trust.

Also, *held*, that the three instruments were not so nearly cotemporaneous as to be taken and construed together; but that if so construed the result would be the same.

(Argued September 26, 1873; decided January term, 1874.)

APPEAL from judgment of the General Term of the Supreme Court of the fourth judicial department, modifying, and affirming as modified, a judgment in favor of plaintiffs, entered upon the report of a referee.

This was an action brought by plaintiffs as heirs at law and next of kin of George Richtmyer, late of Conesville, Schoharie county, deceased, against defendants, the widow, next of kin and heirs at law of Abraham Richtmyer, to recover certain real estate and the value of certain personal property alleged to have been held in trust by said Abraham for the benefit of George, his heirs and next of kin.

Prior to 1835, Peter Richtmyer died, leaving three sons, David, George and Abraham; by his last will, after certain legacies and devises, he devised and bequeathed to his said three sons all the residue of his estate, real and personal. Having in view a division of the estate, George and Abraham, on the 21st day of April, 1835, entered into an agreement, under their hands and seals, of which the material provisions were as follows:

"Whereas, by the last will and testament of our beloved father, Peter Richtmyer, bearing date at Broome, Schoharie county, August the eleventh, eighteen hundred and seventeen, after providing for our dear mother, Heythe, and our several sisters therein mentioned, did order and devise unto his three sons, Daniel, George and Abraham, that all the residue and remainder of his estate, both real and personal, after the debts and legacies were paid, that said property should be divided, share and share alike, and, whereas, we at this time conceive it necessary that a division of said property should be made so far as relates to setting off one equal third part to Daniel, he having a family and children grown up."

"I, the said George Richtmyer, being desirous that my

share shall be and remain in an undivided moiety in connec-
tion with the moiety or share of my brother, Abraham, and
placing full confidence in him hereby do make, constitute and
appoint and by these presents have constituted and appointed
my brother Abraham Richtmyer my true and lawful attorney
for me, and in my name, and for my use and benefit to ask,
demand and receive from the said John Ferguson, John
Richtmyer and Asa Starkweather (the referees to make divi-
sion and partition of the real estate only), my just and full
proportion as bequeathed to me by my beloved father agree-
able to said will, and upon the receipt thereof to make,
execute and deliver a general release or special release dis-
charging my claim and right to the property so far as it shall
be divided, hereby ratifying and confirming all and singular
whatsoever my said attorney shall do in the premises by virtue
hereof, and, whereas, I, the said George Richtmyer, having
toiled in common with my brothers to earn and keep said
property, and being an unmarried man, and advanced to
middle age or past, desiring not to be burdened with the
management, care and anxiety pertaining to earthly posses-
sions, and desiring to have and keep a comfortable home, and
to have and enjoy the necessary comforts of life in sickness
and health, hereby do agree with my brother Abraham to
live with him and to enjoy in common with him the necessary
comforts of life, do hereby agree that my brother Abraham
shall take the charge and direction of the two undivided
shares of said estate, that he shall or may consult with me
whenever he is at a loss, and in all bargains and directions
relative to the same he shall think fit and proper to give, I
agree to acquiesce, and Abraham Richtmyer hereby agrees to
provide for me at all times during my condition of celibacy,
good wholesome food, decent wearing apparel, and to take all
necessary care of me in sickness and health, to furnish for me
at all times, if I choose to travel, suitable means of convey-
ance and necessary money in my pocket, and I am to be at
my option to labor or not, as I shall choose, and my brother
Abraham agrees not to suffer my estate to lessen and dimin-

ish for want of care, or by hazard, or by negligence, and I am and at all times shall be at full liberty to devise and will my estate to whom I please, or upon shift of circumstances in life by marriage, or upon any good and substantial reason of ill usage or mal-treatment, which shall be so judged by any three disinterested men. I am and shall be at liberty to have my moiety or share of said property set off to me, and be at liberty to provide for myself in any way and manner I shall choose; but if my brother Abraham shall fulfill this agreement on his part according to the true intent and meaning thereof, his home shall be my home, and his watch, care, charge and use of my estate shall be his during my state of celibacy. I, the said George Richtmyer, hereby do also by virtue of said power of attorney, authorize my brother Abraham to receive my full share and proportion of the personal estate, and to keep an account of the appraised value or estimated value agreed upon by us, and also I hereby do authorize and empower my said brother to pay my full share of the debts now owed by the estate, and to keep an account of the same to the intent that upon my devising my estate I may know what to devise, or upon my being able to show such cause as upon the judgment of any three disinterested, judicious men, mutually chosen by us, I may separate my property from his. But without such cause thus shown, or any of the causes before mentioned, I agree not to revoke this letter of attorney, and that the charge, direction, use and income of said estate shall be and belong to my brother Abraham, his heirs, executors, or administrators or assigns forever."

On the 7th day of May, 1835, the said George and Abraham executed under their hands and seals another instrument, of which the following are the material provisions :

" Whereas, on the seventh day of May, eighteen hundred and thirty-five, we, George Richtmyer and Abraham Richtmyer, having reviewed this agreement, do conceive it to be defective, and may lead to greater inconveniences and difficulties, and mutually agree to amend the same.

"*First.* All that part of the agreement which relates to George's share of the real estate remaining in common with Abraham's share is hereby abrogated, and in lieu thereof, it is agreed that lot number six, * * * containing three hundred and seven acres and fifty-eight hundredths of an acre shall be set off to the share of George Richtmyer, and that it shall be the duty of the referees named within, to order and award to said George so much money to be paid to him by said Abraham as will make the share of George equal to the value of one-third part of the whole of the real estate to be divided. And it is hereby mutually agreed between said George and Abraham that the amount of money thus awarded to make his share of real estate equal, and the amount of money his share of the personal property shall be valued to be worth shall be put together and remain with Abraham Richtmyer in the same manner as by the preceding agreement the undivided estate was to remain in Abraham's hands. And it hereby is further mutually agreed between said George and Abraham, that out of the whole amount of money due to George when his share of debts are due to the estate shall be added: First. Abraham shall pay my share of the debts the estate owes. Second. He shall build upon said part of the real estate to be set off to George, a good, comfortable farm-house, one and a half stories high, of sufficient size for a farmer and his family, and a small bedroom and parlor for said George, in case it shall be his choice hereafter not to live with Abraham. Also a wood-house and necessary sheds adjoining the barn, and to finish said buildings, and the expense thereof shall be deducted from said amount, and the residue of said amount remaining in Abraham's hands shall be at George's disposal in the same manner as by the first agreement was to be his share of the real estate, and said Abraham is to pay the same consideration for the use of said money and land as by the first agreement he was to pay, and the before mentioned buildings shall be commenced within one year after George shall give to Abraham written notice of his intention to seek a new home,

and shall be finished within two years thereafter, or after the service of the notice; and, whereas, Abraham conceives it necessary to build a small house on said lot next or this year for a farmer to live in, and it is agreed that George shall be at his option to allow the expense of said small house to be deducted from the amount or to sell to Abraham half an acre of land where it stands, or for Abraham to move off said building as said George shall choose, and that the before mentioned letter of attorney, so far as it relates to the personal property, shall be and remain good and valid, and that the charge and management of my real estate shall belong to Abraham in the same manner as was agreed upon by the preceeding agreement.   *   *   *   *   And the said Abraham agrees to improve George's part of the real estate generally, agreeably to sound directions, and especially whenever George shall request it to be done, by clearing up, and fencing whenever Abraham shall conceive it consistent with his other business, and such improvements shall be paid for in the same manner as those specified, and whenever any land shall be cleared all the timber worth sawing shall be saved. But the value of such improvements shall be proportionate to the time they shall be in his use, and the increased value of his land. The management and direction of the business shall belong to Abraham so long as they shall live together."

Lot No. 6 was set off to George. On the 11th day of May, 1835, George executed to Abraham a full and formal quit-claim deed of lot No. 6, which contained this the *habendum* clause:

" To have and to hold the said lot of land with the appurtenances in trust, for the purpose of securing to the party of the first part a good, comfortable living and maintenance, under contingencies of sickness, infirmity and old age to the said party of the second part, his heirs and assigns, to the sole and only proper use, benefit and behoof of the said party of the second part, his heirs and assigns forever."

Under these instruments, Abraham assumed the management and control of George's share of the property, and con-

tinued to control it and receive the rents and profits until his death. George was cared for and maintained until his death, in pursuance of the agreements. He never married, and died intestate.

The referee decided that Abraham took the property simply in trust, and that the heirs at law of George were the owners in fee of the real estate set off to him, and directed judgment to that effect, also for the plaintiff's proportion of the value of the personal property since realized from the sales of lumber, etc., and the difference in value as awarded to equalize the shares of the real estate, together with interest on some of the items. A separate judgment was also awarded against defendant Ervilla, for timber cut from the land by her order after the death of Abraham, her husband. The General Term modified the judgment by deducting interest, and the amount awarded against defendant Ervilla, and affirmed it as modified.

*Lyman Tremain* for the appellants. A devise, grant or conveyance of the " use and income forever," of real or personal estate, carries the land and personal estate itself. (*Craig* v. *Craig*, 3 Barb. Ch., 76; 2 Jar. on Wills [2d ed.], 380; *Reed* v. *Reed*, 9 Mass., 372; *Anderson* v. *Greble*, 1 Ashm., 136; *Dix* v. *Manners*, 1 Spencer, 142; *Fox* v. *Phelps*, 17 Wend., 393; *Rhodes* v. *Rhodes*, 3 Sandf. Ch., 239.) In construing a grant, the rule is, that when anything is granted, all the means to obtain it and all the fruits and effects of it are also granted. (Shep. Touch., 89; 9 Metc., 536; *Rood* v. *E. R. R. Co.*, 18 Barb., 80–85.) The deed from George of May 11, 1835, was a grant with a condition subsequent, and the title could only be divested by a breach of such condition. (Kent's Com. " conditions subsequent; " 1 R. S., 748, § 2.) This instrument having been admitted by the pleadings, neither party can upon the trial deny its legal execution and delivery, or in any way, or manner, invalidate it. (Code, §§ 149, 153, 168; Voorh. Code of 1867, p. 338, and cases there cited; *Brazil* v.

*Isham,* 2 Kern., 9 ; *McKyring* v. *Bull,* 16 N. Y., 297.)
The fact found by the referee that the consideration named
in the deed were not, in fact, paid, can have no influence upon
this case. (*Merriam* v. *Harsem,* 2 Barb. Ch., 232 ; *Bar-
num* v. *Child,* 6 Paige, 526 ; 1 Sandf., 59 ; *McCrea* v. *Pur-
man,* 16 Wend., 460 ; *Pritchard* v. *Brown,* 4 N. H., 397 ;
*Mason* v. *Lord,* 40 N. Y., 477 ; *Matthews* v. *Coe,* 49 id., 57.)
The statute which authorizes a suit against the next of kin
(2 R. S.,. 451, §§ 23, 24), does not aid these plaintiffs ;
the widow · is not embraced in the words " next of kin."
(*Dickins* v. *N. Y. C. R. R. Co.,* 23 N. Y., 158 ; 2 Kent's
Com. [5th ed.], 136 ; 3 Ves. Jr., 244, and note *a ; Garrich* v.
*Ld. Camden,* 14 id., 372 ; 2 Jar. on Wills, 36.) No judg-
ment or decree can be based upon a fact proved, but not
averred in the complaint. (*Brazil* v. *Isham,* 2 Kern., 9 ;
*Lefler* v. *Field,* 50 Barb., 407.) Defendants were tenants in
common in the real estate, and no action of ejectment would
lie on the facts proved. (2 R. S., 307, § 27 ; 4 N.Y., 63 ; 10
Wend., 414, 540.) In an action by one partner for an account-
ing the general rule is, that, in the absence of any demand
and refusal to account, no costs are recovered. (Col. on Part.,
· § 339, and note ; 7 Paige, 443 ; 2 Sandf. Ch., 448.) . In
interpreting the instruments "A," "·B," and " C," no parol
evidence can be received or weighed which contradicts, or in
any manner modifies or varies them. (*Jackson* v. *Troup,* 16
J. R., 172 ; *Whallon* v. *Kauffman,* 19 id., 97 ; *Hunter* v.
*Hunter,* 17 Barb., 25, 78 ; *Harper* v. *Albany M. Ins. Co.,*
17 N. Y., 194 ; *Lamott* v. *H. R. F. Ins Co.,* id., 199, note ;
*Durgin* v. *Ireland,* 14 id., 322 ; *Mumford* v. *Hallett,* 1 J.
R., 533 ; *Pierson* v. *Hooker,* 3 id., 68 ; *Wells* v. *Baldwin,*
18 id., 45 ; 1 Greenl. Ev., 316–321 ; *Thompson* v. *Ketcham,*
8 J. R., 189 ; *Pattison* v. *Hull,* 9 Cow., 747 ; *La Farge* v.
*Ricket,* 5 Wend., 187.) The confessions of parties are subject
to the same exception as parol evidence. ( *Well. Canal Co.* v.
*Hathaway,* 8 Wend., 480 ; 2 Abb. Dig., 700, § 1204 ; *Jack-
son* v. *Cole,* 457 ; *Jackson* v. *Dennison,* 4 Wend., 558 ; *Jack-*

*son* v. *Belknap*, 12 J. R., 96; *Gibney* v. *Marchay*, 34 N. Y., 301; *Law* v. *Morrills*, 6 Wend., 277.)

*Henry Smith* for the respondents. The material papers were all made substantially at the same time, and they are all to be read together. (*Parks* v. *Comstock*, 59 Barb., 16, 33; *Rubber, etc.,* v. *Hovey*, 19 Abb. [N. S.], 74, 76; *Davis* v. *Bush*, McC. & Y. Exch., 89 [J. Am. ed.]; *Van Hagen* v. *Rensselaer*, 8 J. R., 420; *Braybrook* v. *Atty.-Genl.*, 9 H. L. Cas., 150; *Crop* v. *Norton*, 2 Atk., 76; *Whitbeck* v. *Waite*, 16 N. Y., 532; *Morris* v. *Whitcher*, 20 id., 41; *Clute* v. *Jones*, 28 id., 284; *Mott* v. *Coddington*, 1 Abb. [N. S.], 290; 1 Rob., 267.) Parol evidence is admissible to show that a deed, absolute in form, was, in fact, given in trust. (*Siemon* v. *Schurck*, 29 N. Y., 598; 33 Barb., 9; *Swinburne* v. *Swinburne*, 28 N. Y., 568.) The clause in the stipulation of April twenty-first, as to the personal property, gave to Abraham its use only. (*Lounsbury* v. *Purdy*, 18 N. Y., 517, 519; 16 Barb., 376.) If any of these papers appear inconsistent those which seemed designed to contain the basis of the arrangement of the parties would exercise the moulding and controlling influence, and in this case it would be the stipulation. (*Blossom* v. *Griffin*, 3 Kern., 569; *Morris* v. *Whitcher*, 20 N. Y., 41; *Whitlock* v. *Waine*, 16. id., 532; *Clute* v. *Jones*, 28 id., 280; *Moore* v. *Meecham*, 10 id., 207; 1 Greenl. Ev., §§ 283, 286.) Trustees must not in general be allowed to take by mere construction a greater estate than the nature of the trust demands. (Liff. & Bull. on Trustees, and cases cited, 66, 789, 792, 801; Hill on Trustees, 239; *Curtis* v. *Price*, 2 Ves., 89, 100; *Beaumont* v. *Marquis*, 19 Beav., 198.) By the stipulations of April twenty-first and May seventh, Abraham became the attorney and trustee of George, and upon the face of it, the deed of May eleventh is in trust. (1 Story Eq. Jur., §§ 321, 323; Smith's Man. Eq., 205 [1st Am. ed.]; *Mac N.'s note to Whitackre* v. *Whitackre, Mac N. Select Cas.,* 45, M.; *Colburn* v. *Morton*, 3 Keyes, 298, 300, 304, 305; *McMahn* v. *Allen*, 35 N.

Y., 410, 411; *Tate* v. *Williamson*, L. R., 5 [Ch. App. Perkins' note to Am. ed.]; *Kerr* on Frauds and Mistake, 106, 109, 281 [2 Eng. ed.]; 1 Greenl. Ev., §§ 287, 295 *a*, 296 *a*; *Iddings* v. *Bruen*, 4 Sandf. Ch., 223; *Wormby* v. *Wormby*, 8 Wheat., 421; *Prevost* v. *Grats Peters*, C. C., 364; *State* v. *Van Vechten*, 11 Paige, 21, 26; *Bolton* v. *Gardner*, 3 id., 273.) Abraham's declarations as to the manner in which he held this property were admissible. (*Jackson* v. *Bond*, 4 J. R., 230; *Jackson* v. *Van Dusen*, 5 id., 144–156; *Pitts* v. *Wilder*, 1 Comst., 483; C. &. H. Notes, 596, 644, 646; 1 Greenl. Ev., §§ 109, 189, *et seq.*) If the court can see that a just and legal result has been arrived at, it will not disturb the judgment. (*Forrest* v. *Forrest*, 25 N. Y., 501; 8 Bosw., 641; *People* v. *Gongales*, 35 N. Y., 60; *Ville* v. *Goss*, 49 Barb., 98; *Clark* v. *Brooks*, 2 Abb. [N. S.], 385.) There was no improper joinder of causes of action. (*Richtmyer* v. *Richtmyer*, 50 Barb., 56, 58–60, and cases cited; *Farmer* v. *Farmer*, 1 H. L. Cas., 724, 750; *Scott* v. *Gurnsey*, 60 Barb., 164, 181; 1 Story Eq. Jur., § 457; Hopk. Ch., 416; 3 Paige, 222, 517; 2 id., 180; 4 Sandf. Ch., 224; Story Eq. Pl., §§ 202, 207, 208, 210, 214; 12 Abb., 47; 4 Bosw., 537; 6 How., 381–382; 3 Abb., 206; 17 N. Y., 598, 606–608; 16 id., 84, 94–97; *Gen. M. Ins. Co.* v. *Benson*, 5 Duer, 168; 1 Barb. Ch., 92; 4 Sandf. Ch., 224; 11 N. Y., 494; 2 R. S., 451, § 23; 2 Edm. St., 470; 2 id., 452–455; 2 id., 472; 2 id., 455, §§ 52, 53; 2 id., 474, 475; *Kellogg* v. *Olmstead*, 6 How., 487; *N. Y. & C.* v. *Schuyler*, 17 N. Y., 592; 34 id., 30; 7 Abb., 41, 38; Barb., 534; 34 How., 302; *Towner* v. *Tooley*, 38 Barb., 598, 606–608; *Trustees* v. *Kellogg*, 16 N. Y., 84; *General.* v. *Benson*, 5 Duer, 168; *Armstrong* v. *Hall*, 17 How., 76; *Pagsley* v. *Aiken*, 11 N. Y., 494; *Benjamin* v. *Taylor*, 12 Barb., 328.)

Earl, C. The rights of the parties in this action depend mainly upon the construction and effect to be given to the three written instruments marked upon the trial exhibits A, B and C. Parol evidence cannot be used to explain, modify

or contradict these writings. The rule which excludes such evidence applies not only to prior and cotemporaneous oral declarations, but with equal force to subsequent declarations. The object of putting agreements into writing, is to exclude, as said by Lord COKE, a resort to " the uncertain testimony of slippery memory." A writing would be of little consequence unless in construing it, judges are to be confined to the language used. They may resort to surrounding circumstances so as to stand in the very light, as near as possible, which the parties stood in. But this they may do, not to import anything into the writing which is not expressed by the language used, but that they may understand the language, and whatever the language is found clearly to import, must be held to have been intended by the parties, no matter how strongly facts not contained in the writing point to a contrary intention. The intention after a resort to such helps as the law allows, must be sought for in the writing alone.

In disposing of this case, we must assume that exhibits A, B and C were valid instruments. There is no allegation in the complaint that they were procured by fraud, or that George Richtmyer was incompetent, or that he was in any way imposed on by his brother Abraham. They are treated as valid in the complaint, and copies of them are annexed thereto. They are in no way assailed in the complaint, and the only duty we have in reference to them, is to determine what they mean. By exhibit A, which bears date April 21, 1835, George Richtmyer, agreed with his brother Abraham, that his share of the real estate, owned by the three brothers in common, should remain undivided with Abraham's share, and he constituted Abraham his attorney, to take and receive his portion of the real estate, and to release all his claim to the balance; he agreed that Abraham should take the charge and direction of the two undivided shares of the real estate, and that he would acquiesce in his bargains and directions in reference thereto. He also authorized Abraham to receive his share of the personal estate, and agreed with him that he would not at any time revoke the power of attorney, except

for one of the causes mentioned, and that "the charge, direction, use and income of said estate," should belong to his "brother Abraham, his heirs, executors, or administrators, or asignees forever." As a consideration of the conveyance of his estate to Abraham, George was to have a home with, and be supported by Abraham. There were only two causes for which George could resume the control of the estate during his lifetime. One was his marriage, and the other was, his ill-usage or mal-treatment by Abraham, to be adjudged by three disinterested men. Subject to these two contingencies, there is nothing in this instrument to impair Abraham's perfect and absolute control over the estate during the lifetime of George. The parties evidently understood that the estate was in such way conveyed to and vested in Abraham, that without the happening of one of the two contingencies mentioned, George could not even dispose of his estate by will, and hence it was specially provided that he should, at all times, be at liberty to devise and will the estate to whomsoever he pleased. But in case he did not resume the estate for one of the causes mentioned in his lifetime, and he made no will, there is not even a hint in the instrument, that Abraham's estate was not thereafter to be perfect. If it was the intention, that Abraham was to have an estate only during the lifetime of George for his support, why was it provided that the estate "shall be, and belong" to Abraham? Not only this, but to " Abraham, his heirs, executors, or administrators, or asignees forever?" What purpose can such language serve, if Abraham was at most, to have an estate during the lifetime of George only? This instrument was in form sufficient to convey the whole estate to Abraham; it was signed, sealed and witnessed. A grant of the use and income of real or personal estate, forever carries the fee of the land, and the personal estate itself. (*Fox* v. *Phelps*, 17 Wend, 393 ; *Reed* v. *Reed*, 9 Mass., 372; *Craig* v. *Craig*, 3 Barb. Ch., 76 ; Co. Lit., 4 *b* ; *Caldwell* v. *Fulton*, 31 Penn. St., 484; *Clement* v. *Youngman*, 40 Penn. St., 344; 3 Washburn on Real Prop., 333.) The fact that Abraham was to keep an account

of the personal estate, in no way conflicts with these views, but rather supports them, as the only reason assigned for keeping the account is, that George's share of the property may be separated, in case of the happening of the contingencies mentioned.

I am, therefore, of opinion, if the claims of Abraham's family and heirs rested alone upon exhibit A, their title to the property in dispute could not be questioned by the plaintiffs; but, on the seventh of May, George and Abraham executed another instrument, which is called exhibit B. This was also signed, sealed and witnessed, and I infer from its language that it was attached to the other one. The only express modification of the prior one is in reference to that portion thereof which provides that George's share of the real estate should remain in common with Abraham's. It was agreed that the referees should set off a certain tract of land for George's share, and, to make equality of partition, that they should award George such a sum of money, to be paid by Abraham, as would, added to his real estate, give him one-third in value of the real estate to be divided among the three brothers, and that this sum of money should remain in Abraham's hands, as provided in the prior agreement. It was then provided that out of George's personal estate in his hands, he should build a house and other buildings on the lands set off to George, for him, "in case it shall be his choice hereafter not to live with Abraham." So far, there is nothing in the agreement affecting the title to the land which Abraham took under the former agreement, except that the two shares were not to be set off together; but George's share was to be designated, so that, upon the happening of either of the contingencies mentioned in the prior agreement there would not have to be a further partition. The provision that George might, if it should be his choice, live in the new house to be built, did not discharge Abraham from his support, as provided in the former instrument. This was, probably, intended to provide a house for George in case, for any reason, he should prefer not to live in Abraham's family. It is further provided, that

the balance left of the personal estate, after building the house, should remain in Abraham's hands, as provided in the prior instrument, and that that instrument should remain in force as to the personal estate, and that Abraham should have the charge and management of the real estate in the same manner as was agreed upon by the preceding instrument. Without particularizing further, there is nothing in this instrument releasing Abraham from the support of George as provided in the prior instrument, and nothing whatever to take from him and his heirs "the charge, direction, use and income of the estate forever," as also provided in that instrument, subject to the three contingencies therein mentioned. The last instrument is more obscure and uncertain in its terms than the prior one; but as it was annexed to the prior one, and intended simply to modify that, the two must be construed together, and the prior one must be left in force, except as it is thus modified. All the provisions of the latter instrument are in harmony with the general intent manifested in the former one, to give the whole estate to Abraham, subject to the three contingencies mentioned. By the first instrument the estate became vested in Abraham, and he could be divested of it only by the happening of some one of the contingencies, or a reconveyance in some form. There was no language used in the second instrument which could work a reconveyance.

That I have not misconstrued these two instruments is made still more manifest by exhibit C. The parties doubtless supposed that a more formal instrument was requisite to pass the legal title to the real estate, and hence George executed this deed on the eleventh day of May. It is a full, perfect and formal deed, and by it he conveyed all his real estate — describing it — to Abraham, his heirs and assigns, forever. The *habendum* clause is as follows: "To have and to hold the said lot of land, with the appurtenances, in trust for the purpose of securing to the party of the first part a good, comfortable living and maintenance, under contingencies of sickness, infirmity and old age, to the

said party of the second part, his heirs and assigns, to the sole and only proper use, benefit and behoof of the said party of the second part, his heirs and assigns, forever." That portion of the deed called the premises gives Abraham, his heirs and assigns, forever, an absolute title in fee to the lands conveyed. There is an apparent attempt to qualify this title in the *habendum* clause, but that clause cannot have the effect claimed by plaintiffs' counsel. It is said in 4 Kent's Commentaries, 468, that the *habendum* clause "cannot perform the office of divesting the estate already vested by the deed, for it is void if it be repugnant to the estate granted." Judge SUTHERLAND, in *Jackson* v. *Ireland* (3 Wend., 100), says: "No doubt the premises in a deed must control where the *habendum* clause is inconsistent with it." In *Tyler* v. *Moore* (42 Penn. St., 386), Mr. Justice STRONG says: "The purpose of an *habendum* is to define precisely the extent of the interest granted. It may lessen, enlarge, explain or qualify ·the interest described in the premises, but it must not be totally repugnant to it. Thus, if in the premises an estate be granted to one in fee simple, that is to one and his heirs, it may by the *habendum* be lessened to an estate tail, that is to an estate to him and the heirs of his body. In such a case, effect will be given both to the premises and to the *habendum*. The latter does not contradict the former; it only defines what heirs of the grantee were intended by it. Still it is true that if the *habendum* be absolutely repugnant to the premises, if it cannot be reconciled with them so that full effect can be given to both, it must give way and the premises must stand. Thus, if there be a grant to one and to his heirs, *habendum* to him for life, there is an irreconcilable contradiction, for it cannot be an estate for life and at the same time an estate in fee simple; either the word heirs in the premises must be stricken out or effect must be denied to the *habendum*. In a deed the premises will prevail." (See, also, 3 Wash. on Real Prop., 372, etc.) Here the *habendum*, if it be admitted that it was intended to cut down Abraham's interest to an estate for the life of George or for a shorter

period, so far as this intent is manifested, is totally repugnant to and irreconcilable with the premises, for in them a fee simple is granted. The *habendum* cannot frustrate, abridge or lessen the estate granted, but it may limit the uses to which the estate shall be held. (3 Wash. on Real Prop., 375, § 64; Shep. Touch., 114; *Nightingale* v. *Hidden*, 7 R. I., 118.) If it was the intention by the *habendum* that the income of the estate granted should, during the life of George, be applied to his support, then there probably would be no repugnancy between the *habendum* and the premises, as the quality of the estate granted would not be cut down, but the fee would be left unimpaired, the use only of the land being limited during a certain period for a certain purpose. But here no trust was created, to receive the income or rents and profits of land and apply them to the support of George. But Abraham was to hold the land in trust for the purpose of securing a support to George. What kind of a trust was this? How was George's support to be secured? Such a trust, undefined and uncertain in its nature, could not probably be carried into effect. It is not such a trust as is authorized by the Revised Statutes (1 R. S., 728, § 55), and it cannot, therefore, be upheld as a strict technical trust in real estate. The only way, therefore, that the *habendum* clause can have any force at all is to hold, upon the whole deed, that the real estate in fee simple was conveyed to Abraham charged with George's support, or upon condition that he should support George. In either view, and in any aspect, George having been supported during his lifetime, the land, upon his death, became freed from the condition, charge or supposed trust.

I have thus far considered this deed standing by itself. It is claimed, however, by the learned counsel for the plaintiffs, that exhibits A, B and C are so nearly cotemporaneous in time, and so far relate to the same transactions, that they must all be considered together. I cannot admit this. It is undoubtedly the rule that several instruments of the same date, between the same parties and relating

to the same subject, may be construed as parts of one contract. (*Jackson* v. *Dunsbagh*, 1 Johns. Cas., 91; *Stow* v. *Tifft*, 15 Johns., 458; *Jackson* v. *McKenny*, 3 Wend., 233; *Van Horne* v. *Crain*, 1 Paige, 455; *Hill's* v. *Miller*, 3 id., 254; *Cornell* v. *Todd*, 2 Denio, 130; *Hull* v. *Adams*, 1 Hill, 601; *Howes* v. *Woodruff*, 21 Wend., 640; *Rawson* v. *Lampman*, 5 N. Y., 456.) I have cited these numerous cases to show how uniformly the rule is announced as applying to instruments of the same date. I can find no case where it has been applied to instruments of different dates or executed at different times. And the reason of the rule does not apply to such instruments. When parties execute several instruments at the same time, relating to the same subject, such instruments may be presumed to have had the same general object and to have been influenced and shaped by the same general intention. It cannot be presumed, in such case, that the parties at one and the same time had different and conflicting intentions as to the same subject-matter. But the same reason for the rule does not apply when the instruments are executed at different times. In this case, we have first inquired for the intention of the parties when they executed the first instrument, on the twenty-first day of April. How is any light thrown upon that question by the instrument executed on the seventh day of May? The parties may then have had a different intention, or they may entirely have abandoned the intention they had on the twenty-first day of April. I admit, however, that these two instruments are to be read together; not for the purpose of ascertaining what the parties intended by the first instrument, but for the purpose of seeing how far the first was modified by the second. And after we have ascertained the extent of this modification, all parts of the first instrument not modified are to be construed as if no other instrument had been executed. So the deed executed on the eleventh day of May may have been the result of some new intention, or prompted by some new consideration or inducement; it cannot afford evidence of what the parties intended on the twenty-first of April or the

seventh of May. I have thus deemed it the proper course to consider each of the three instruments by itself, except so far as one is modified by another. But if we construe these three instruments together, as if they had all been executed at the same time, we must still reach the same result. Then we may hold the trust referred to in the deed to be the same mentioned in exhibit "A." There we find the whole estate, in language several times repeated, given to Abraham, his heirs and assigns, forever, charged with the support of George and liable to be defeated only upon the happening of one of the three contingencies mentioned in that exhibit.

The conclusion I reach, therefore, upon the whole case, is adverse to the plaintiffs, and, if I am right, it is not possible for them to succeed in any aspect of the case.

The judgment of the General Term and that entered upon the report of the referee should be reversed, and judgment ordered for the defendants dismissing the complaint.

Reynolds, C. At the time of the transactions out of which this controversy has originated, George Richtmyer was unmarried, had no children, was free from debt, the owner of property, and in a condition of mind that enabled him to dispose of it according to his pleasure, and he so remained until the time of his death, intestate. It is not claimed that he had an intellect of any marked capacity, nor is it any where pretended, so far as I can discover, that the agreements made with his brother Abraham, with respect to his support and the management and final disposition of his property were invalid, for any fraud or imposition practiced upon him. In fact, the whole case concedes his capacity to contract, convey or dispose of his estate by last will and testament. If George had made a will giving all his property to Abraham and his family, it is difficult to see how the plaintiffs, who represent a portion of his next of kin and heirs at law, could have questioned its validity.

In 1835, the three brothers, George, Daniel and Abraham Richtmyer, who had received an undivided estate under the

will of their father, thought it expedient to separate, at least in some respects, their several interests. This determination resulted in awarding to Daniel, in severalty, his portion of the property, and in an arrangement as between George and Abraham, the legal effect of which is now to be decided. Without examining in minute detail the somewhat complicated agreements, made between George and Abraham, all of which are to be regarded as made to achieve one common purpose, it is sufficient to state what I think is their general import and legal effect. It may be fairly assumed that George preferred to reside with his brother Abraham, and to some, and perhaps a large extent, remain under his protection and care. He was not ambitious to increase his property, nor inclined to be burdened with its preservation. There is no indication that he was unduly disposed to labor of any description, and he was content with an adequate and comfortable support, in sickness and in health, in idleness or industry, at least, during his life of celibacy, and to secure this, he was apparently willing to pledge his entire estate; and, as before said, he had a perfect legal right to do this, without any regard to the fact whether the consideration shall be regarded adequate or otherwise. The agreement, therefore, made with his brother Abraham, further provided for this contingency so long as George chose to reside in Abraham's family, and if he chose to reside separately, Abraham was to provide him a separate establishment. He was at liberty to devise his estate by will. If he married, or Abraham ill-treated him, he was to have his property set off and provide for himself as he pleased in a separate establishment; but if Abraham performed his part of the contract, and none of the contingencies named should happen upon which the contract was to terminate, then the estate was to belong to Abraham and his heirs. It so happened that, in 1864, George died intestate, unmarried, without issue and an inmate of the family of Abraham, who had fully performed his part of the arrangements made in 1835. I find nothing illegal or invalid in the arrangements made between George and Abraham, and I am not able to discover

any trust .fastened upon the estate of George, in favor of his next of kin and heirs at law. If the estate or interest of Abraham was merely an estate during the life of George, I can well see how his next of kin and heirs at law may claim the remainder ; but the notion that any trust has been created in their favor by the papers before us, seems to me entirely fabulous. I think it very plain to be seen that George intended to give all his property to Abraham, if the latter should deal with him according to the arrangements ; in case George should not marry or elect to dispose of his property by will, and this he did not do.

In my opinion the plaintiffs have no claim, in law or equity, against the estate of George Richtmyer, and the judgment of the Supreme Court should be reversed, and the complaint dismissed.

All concur ;. Gray, C., not sitting.

Judgment reversed, and judgment for defendants dismissing complaint.