## In the Matter of the Estate of FRANK E. CAMPBELL, Deceased.*

Surrogate's Court, New York County, August 16, 1937.

* See, also, 165 Misc. 808.

*McCanliss & Early*, for the administrators.

*Sapinsley & Lukas*, for Lewine Holding Corporation.

DELEHANTY, S. At his death deceased had a controlling interest in a corporation which in turn owned all of the capital stock of a realty company which had the legal title to a parcel of property improved by an apartment house. In August, 1932, the property in question was subject to three mortgages. The last in point of lien was owned by the claimant here. Deceased had entered into an agreement sometime in 1931 wherein among other things he agreed, in the event of foreclosure of prior mortgages, to pay to the claimant here any deficiency in the collection of its mortgages up to but not exceeding the sum of $25,000. In August, 1932, an opportunity presented itself for purchase and satisfaction of the second mortgage at a substantial discount. That purchase was made through contributions from the resources of deceased and of claimant. The advances by claimant for this purchase have been refunded to it. The eventual result of the transactions then contemplated was that the second mortgage was wholly eliminated, the third mortgage (now becoming a second) was reduced as to principal sum, this mortgagee made various stipulations respecting the due date of the principal and respecting the payment of interest thereon and deceased obtained an acknowledgment that his 1931 guaranty had been fully satisfied except that the clause concerning his deficiency liability would continue to bind him subject to a credit against his $25,000 liability of any payments which he made under the new arrangement.

The program of mortgage cancellation, mortgage reduction and mortgage extension resulted in the execution and simultaneous delivery of four separate instruments. Against the background of opinion respecting realty in the summer of 1932 it is quite apparent that deceased felt that there was still a prospect of salvaging something of the large investment which he or his controlled corporation had put into the property and that deceased was seeking through the plan which culminated in August, 1932, to improve the status of the property so far as its indebtedness was concerned and also to work out a program which would assure a continuance of control of the property by deceased through his corporations and would assure a reasonable time within which the property might earn its way out of its difficulties. At the time the August, 1932, agreements which are before the court as exhibits were executed the property was in a current position. No installment of interest then due was unpaid. The first half taxes for the year 1932 were fully paid. The water charges for the year 1932 were fully paid. The agreements plainly looked to the future of the property and (having as their eventual objective so far as deceased was concerned the salvaging of his equity) had for their immediate objective a plan for the management of the properties and a disposal of the gross income. In the circumstances shown all of the agreements must be regarded as constituent parts of a whole plan. All of them, therefore, must be read to determine the meaning of any one of them. (*Utica City Bank* v. *Gunn*, 222 N. Y. 204, 207; *Rasmussen* v. *New York Life Insurance Co.*, 267 id. 129; *Manufacturers Trust Co.* v. *Steinhardt*, 265 id. 145.)

The immediate question concerns itself with the meaning of the following clause in the so-called " guaranty agreement " signed by deceased.

" 1. The guarantor agrees that in the event that the gross income of the 145 East 74th Street Corporation are insufficient to meet the carrying charges of said premises, including the interest on the first mortgage, taxes and water rates, and general operating expenses, that he will advance for such purposes a sum or sums aggregating not in excess of $25,000 to meet such expenses.

" In the event that said Guarantor advances to said 145 East 74th Street Corporation said sum of $25,000 or any part thereof on account of the said deficit or deficits, then in such event any sum so advanced shall be deemed a payment in reduction of the obligation contained in the collateral bond of the Guarantor held by the Mortgagee bearing date the 23rd day of April, 1931.

" The parties agree that the $25,000 original obligation of the Guarantor on said collateral bond has been satisfied and the only

obligation of the Guarantor remaining under said collateral bond is that contained in the paragraph reading as follows:

" ' And do further agree and covenant that if a proceeding in foreclosure be brought upon either of the prior mortgages, now liens upon said premises, which mortgages are set forth in said modification agreement, and if said proceeding be carried to a conclusion, and the premises be sold thereunder, a further payment of $25,000 to said Irving I. Lewine, Inc., its successors or assigns, upon the entry of a final judgment of foreclosure and sale.' "

In the recitals which precede the guaranty just quoted there is a statement of money needs which includes the need for funds to pay " on account of the principal indebtedness due under the first mortgage." In the accompanying instrument executed by the third mortgagee with the corporation holding the record title there is provision for the disposal of the gross income from the property wherein the order of payment is provided and priority fixed (a) for housekeeping expenses, (b) payment of interest on the first mortgage, (c) payment of principal installments on the first mortgage, (d) payment of taxes and water charges, (e) payments, if earned, on account of interest and principal on the third mortgage (which became the second mortgage in the transaction), and, finally, payment of any surplus to the owner of the fee. In the separate agreement which expressly modified the mortgage terms so far as the claimant mortgagee was concerned similar provision for use of the gross income was made.

The first question presented is whether or not the guaranty quoted above covers any required payment on account of the principal of the first mortgage. At the time the agreements were executed in August, 1932, no moratorium statute was in existence. At that date any mortgagee having the right to a payment on account of principal might foreclose for non-payment of such installment. Since the purpose to be served by the whole body of agreements was the avoidance of foreclosure and the carrying of the property in an effort to salvage the equity it must be held that one of the items necessarily within the contemplation of the parties was the possible demand of the first mortgagee for payment in reduction of the principal of that mortgage. The only sources of funds for the payment of all the charges which the agreements referred to were, *first*, the gross rents of the property itself, and *second*, the resources of deceased to the extent of his pledge of them. The text of the guaranty speaks of " the carrying charges " and of " general operating expenses." In effect the argument of the estate is that the words " carrying charges " are limited in meaning by the text following such words which specifically speak

only of interest on the first mortgage, taxes, water rates and general operating expenses. The estate argues that the real meaning of the parties would be stated if the word "including" which precedes the reference to interest, taxes, water rates, etc., should be changed to the words "to wit." That is not the meaning of the words "carrying charges" as the parties intended them and in fact declared them by this series of instruments. The carrying charges with which they were dealing were all the charges which had to be met in order to carry this property in the ownership of deceased's controlled corporations without foreclosure and among them was the principal installments on the first mortgage if any were demanded.

The point is of importance because the estate representatives argue that in each twelve-month period since the guaranty was signed the property has either produced a surplus or has run at only a slight operating deficit if the payment of capital charges, so called, are eliminated. The estate representatives include in this category of capital charges all payments in reduction of the principal of the first mortgage, all rehabilitation work in the apartment building, all new equipment supplied for the convenience of tenants and generally all charges which would be catalogued as principal expenditures on an accounting basis where differentiation between principal and income items would be important. This contention of the estate representatives departs from the meaning of the instruments as intended and declared by the parties. They were dealing with an apartment house which had to be kept in order, in which proper facilities had to be installed in order to keep or to obtain tenants and in the operation of which expenditures had to be made out of the gross intake whether or not in the income tax return of the owning corporation such expenditures fell within the class of capital disbursements or income charges.

The nature of the objectives sought by the parties to these instruments controls the interpretation of the particular instrument here in issue because if the objectives were to be attained the payments required had to be made as need arose. In the practical operation of the agreement it was not feasible to wait until some future date for a statement of operations. The agreements envisaged the need for money whenever a tax bill was due or a mortgage principal installment had to be met or a mortgage interest date arrived. The parties no doubt supposed that the housekeeping charges, so called, would be paid from current rents and that the emergency demanding contribution by deceased would arise only when a large sum was needed. Having that view of the agreement it follows that the argument of the administrators based

upon the earnings of the property on a twelve-month or a calendar year basis is wholly irrelevant. Essentially it is equally irrelevant to consider claimant's data as to accrued liabilities for taxes and mortgage interest existing at the time the contracts were signed. The gross or net earnings of the property during any particular fixed period are of no consequence. The thing which is of consequence is whether when an obligation of the property became due the gross rents then on hand sufficed to meet it. If they did nothing was demandable from deceased. If they did not he agreed to make up the difference subject only to the maximum level of his liability.

Having that concept of the effect of the agreement it is necessary to consider the form in which the issue is here presented. The account in Schedule I refers to the guaranty of the deceased and " decedent's contingent liability under " it. In the petition the claimant is referred to as " a creditor under a guaranty." Except for this reference to the claimant in Schedule I of the account it is not elsewhere listed in the account except as a creditor holding a promissory note. The claimant filed objections in which it describes itself " as a contingent creditor of the above entitled estate." Its objections say nothing about its claim under the guaranty but raise issues respecting other claims allowed and payments made by the administrators. They also assert the non-inclusion of assets of deceased. The administrators moved to dismiss the objections on the ground that the claimant was not a creditor of the estate and that even if it should be catalogued as a contingent claimant the court should not authorize a reserve for the claim. It was upon the issue of status thus formulated that the question was first presented to the court. The minutes (pp. 138 to 149, inclusive, and particularly pp. 147 and 148) show that the counsel for the estate and the claimant disagreed — the one asserting that the claimant had no status as creditor, the other that the claimant had a present claim for $9,720 and accrued interest. Though the parties still insisted on their respective viewpoints throughout a portion of the hearing, a ruling on a question of evidence (pp. 170 to 171 of the minutes) seems to have elicited an agreement by both sides that the point at issue was whether or not there was presently due to Lewine Holding Corporation the sum of $9,720 representing the second half of taxes of 1933 on the premises to which the various agreements referred. This tax liability was discharged before the case was submitted to the court but it was stipulated that this was at the cost of leaving unpaid other and equivalent items. The question of liability, therefore, remains the same.

The court is of opinion that nothing is due to the claimant, not because nothing is due from the estate to any one, but because the claimant is not entitled to have it. This series of agreements never contemplated that any money would pass directly from deceased to Lewine Holding Corporation. Both deceased and the mortgagee were anxious to preserve the property from foreclosure by the first mortgagee. The payments contemplated by the agreements were payments designed to prevent that foreclosure and hence were payments that had to be made to others than the parties to the agreements. The apparent theory of the claimant is that if a particular obligation of the property which would be a basis for foreclosure of the first mortgage is left unpaid, the claimant becomes entitled to recover that money. With this position the court disagrees. The claimant has the right on the facts developed here to ask a court of equity to compel performance by deceased's estate of his contract to furnish the funds. Whether the funds be furnished to the corporation controlled by the estate so that it may pay the overdue item or whether the estate is compellable to pay the obligation directly need not here be considered. While this court has full equity power on an accounting (*Matter of Raymond* v. *Davis*, 248 N. Y. 67), the issue presented by the original objections gives the court no power to make any direction. The issue formulated by the motion to dismiss leaves the court equally without power. Of course, the court has no power to depart from the issue as finally formulated by the parties and thrust upon them some other solution which they have not advanced. More than that, the proper interpretation of the agreement and the enforcement of rights thereunder would involve taking further proof and ascertaining the extent to which deceased has already discharged his obligation and the extent to which his estate may be compelled to make contribution as of the date of the hearing. The first mortgage not having been foreclosed the claimant has no basis for fixing damages payable to it. It must seek enforcement of the agreement according to its terms or content itself with seeking a reserve for its claim pursuant to section 207 of the Surrogate's Court Act.

Accordingly the court on the present record must dismiss the claim for $9,720 and interest, reserving, however, to Lewine Holding Corporation the right to make such other claim against deceased's estate as it may be advised.