## McCULLOCH v. CANADIAN PAC. RY. CO. et al.

### No. 511.

District Court, D. Minnesota,
Fourth Division.

June 29, 1943.

Frank J. Morley, Kenneth Taylor, and Harry E. Howlett (of Kingman, Cross, Morley, Cant & Taylor), all of Minneapolis, Minn., and Reese D. Alsop (of Hunt, Hill & Betts), of New York City (Hunt, Hill & Betts, of New York City, and Myron Frantz, of Chicago, Ill., of counsel), for plaintiff.

Henry S. Mitchell, of Minneapolis, Minn. (Mr. Terrance Hanold, of Minneapolis, Minn., of counsel), for defendant Canadian Pac. Ry. Co.

G. Aaron Youngquist (of Fowler, Youngquist, Furber, Taney & Johnson), of Minneapolis, Minn., for defendant Duluth, So. Sh. & A. Ry. Co.

Sigurd Ueland, of Minneapolis, Minn., for defendant trustees.

NORDBYE, District Judge.

The facts necessary to an understanding of the case appear to be the following:

When the Duluth, South Shore and Atlantic Railway Company (hereinafter called the South Shore) was organized by a syndicate in 1886–1887, the Marquette, Houghton & Ontonagon Railroad (hereinafter called the Marquette) operated from Nestoria, Michigan, to Marquette, Michigan, and the Detroit, Mackinac & Marquette Railway Company (hereinafter called the Detroit) operated from Marquette, Michigan, to Soo Junction, Michigan. The South Shore lines were to extend through that area from Duluth, Minnesota, to Sault Ste. Marie, Michigan. Consequently, the organizers of the South Shore took two steps to include the Marquette and Detroit facilities within the South Shore system: First, they purchased the insolvent Detroit road outright at a foreclosure sale; second, they obtained a perpetual lease of the entire Marquette road from the Marquette Board of Directors on April 15, 1887. Although the Marquette stockholders were not consulted, they did not object to the arrangement at any time.

According to the lease, South Shore acquired the right to manage, operate, and control the Marquette road, and, in return, was obligated to share the profits of the South Shore system with Marquette

in the proportion which the length of the Marquette bore to the length of the entire South Shore system. If this payment to Marquette was not sufficient to meet the interest on the outstanding Marquette securities, South Shore was obligated to provide the required additional amount. When the lease was executed, the following Marquette interest-bearing securities were outstanding:

$1,427,500 Marquette 8's maturing in 1892
   576,000 Marquette 6's maturing in 1908
 1,500,000 Marquette 6's maturing in 1923
 1,400,000 Marquette 6's maturing in 1925
 3,278,456 Marquette 6% preferred stock

The perpetual lease and the Detroit properties were transferred to South Shore by its organizing syndicate on or about April 15, 1887. As consideration for these assets, the South Shore gave the syndicate $4,000,000 five per cent fifty-year non-callable South Shore bonds (hereinafter called Fives), 100,000 shares $100 par value South Shore preferred stock, and 120,000 shares $100 par value South Shore common stock. As security for the Fives, South Shore executed a mortgage (hereinafter called the Mortgage of 1887) of which the Central Hanover Trust Company was trustee.

In both the mortgage and the bonds, South Shore covenanted that the Fives would be a lien against all the present and future South Shore property, including South Shore's "right to possess, maintain, and operate the railroads of the Marquette" under the perpetual lease dated April 15, 1887.

Another five per cent bond issue was created by South Shore on June 1, 1888. Although the mortgage which was given as security for these bonds (hereinafter called the Consolidated Mortgage of 1888) provided that the Fives could be exchanged for the new bonds, no such exchanges were made under that provision. In fact, these so-called Consolidated bonds never were issued to the public. They were pledged as security for South Shore's floating debt.

On August 2, 1888, one Thomas and one Brice, who were the majority stockholders in the South Shore, transferred a majority of the South Shore stock to the Canadian Pacific Railway Company for $1,975,000. On the same day, four new members were added to the South Shore Board of Directors. Three of these new directors were officers or directors of the Canadian Pacific; the fourth was the Canadian Pacific counsel. By that time, the Canadian Pacific had completed a line to Sault Ste. Marie, Michigan.

Both before and after 1888, the South Shore was a losing venture financially. The South Shore floating debt in June, 1888, amounted to $1,200,000. The operations of 1888 created a deficit of $79,837, and the 1889 operations resulted in an additional deficit of $53,666. By the end of 1889, its floating debt had mounted to $3,435,437, and on July 17, 1890, to $3,733,749. In addition, a Marquette bond issue was maturing in 1892. Under existing arrangements, Marquette was unable to pay that debt, which was prior to South Shore's rights against the Marquette properties under the perpetual lease.

Realizing that adjustments must be made, and seeking to stabilize South Shore financially so that its future operations would be guaranteed, Canadian Pacific, the South Shore, and the Marquette entered into a series of transactions on and about July 17, 1890.

First: On or about July 17, 1890, the Marquette and South Shore stockholders and directors rescinded the perpetual lease on the Marquette properties which had existed since 1887. This rescission was made after Mr. Thomas and the Canadian Pacific had purchased a majority of the Marquette stock.

Second: On July 17, 1890, South Shore and Canadian Pacific entered into the Traffic Agreement dated May 27, 1890, which is one of the pertinent contracts or agreements in this case. The object of this agreement was to create a situation which would redound "to the advantage of the parties hereto and of the Marquette Company." In pursuing the purpose of this agreement, South Shore agreed in Article Third to issue First Consolidated four per cent one-hundred year bonds (hereinafter called Fours) " * * * to the amount of not exceeding Twenty million dollars ($20,000,000) par value, in the first instance, secured by a mortgage constituting a valid lien upon all the real and personal property of both the South Shore and the Marquette Companies."

And in Article Fourth, South Shore covenanted to

" * * * apply the said bonds to the following purposes, in the following order:

"I. Four million dollars ($4,000,000) par value thereof, to the sole purpose of retiring at or before maturity, bond for bond, a like amount of first mortgage five per cent (5%) South Shore bonds.

"II. One million four hundred thousand dollars ($1,400,000) to the sole purpose of retiring, at or before maturity, bond for bond, a like amount of Marquette six per cent (6%) mortgage bonds falling due in the year 1925.

"III. So much as may be necessary for that purpose, to retiring the other bonds * * * constituting a lien upon the property of the Marquette Company, at or before their maturity.

"IV. So much as may be necessary to paying off its floating debt and extinguishing the Consolidated mortgage now existing.

"V. The residue to the improvement and extension of the South Shore Railway, to perfecting its title to the Marquette lines, and to any other lines forming part of the Marquette system, and to the improvement and development thereof."

And in Article Fifth of the Traffic Agreement, the Canadian Pacific promised that " * * * as fast as the said new four per cent (4%) mortgage bonds are exchanged for any of the said outstanding bonds * * * at par, or as fast as such bonds are issued, exchanged, or sold upon other terms, with the consent in writing of the Pacific Company, the latter company will execute a guaranty, under its corporate seal, upon the new bonds so issued, * * * for the payment of interest thereon, during the entire term thereof, at the rate of four per cent (4%) per annum, payable semi-annually. * * *"

In addition, South Shore and Canadian Pacific agreed that no subsequently authorized bonds would be prior to the Fours and that the "management and workings of all the railways belonging to the South Shore Company and Marquette Company" would be subject to Canadian Pacific supervision whenever Canadian Pacific was required to pay the interest on the Fours in accordance with its promise in Article Fifth. Likewise, Canadian Pacific was entitled to take up the interest coupons which it paid, and South Shore was required not to compete with the Canadian Pacific and to direct all possible business towards it. In addition to these promises,

Canadian Pacific was to receive, and did receive some time after May 1, 1892, $2,-000,000 of Fours.

Third: On July 17, 1890, South Shore and Marquette executed an Agreement of Sale with respect to the Marquette properties. This agreement provided that the South Shore would become the outright owner of all the Marquette "railway and other property, real and personal." As consideration, South Shore promised to assume liability on the outstanding Marquette bonds and to retire them by using an equal amount of the Fours upon which Canadian Pacific had promised to guarantee the interest. South Shore further promised to exchange the outstanding Marquette stock for Fours and to retire all of its own outstanding bonds, including Fives, so that the Fours upon which Canadian Pacific would guarantee the interest would be the only outstanding South Shore bond obligations.

Fourth: The other transactions of July 17, 1890, consisted of South Shore's executing a mortgage (hereinafter called the Mortgage of 1890) as security for the Fours. It provided for their issuance, and that the Fours were a lien on all South Shore and Marquette properties.

The Traffic Agreement and the other transactions of July 17, 1890, continued without cancellation or modification until May 22, 1936. On that date, South Shore and Canadian Pacific executed the "Supplement to the Traffic Agreement dated May 27, 1890" (hereinafter called Traffic Agreement Supplement). It modified the Traffic Agreement by releasing South Shore from its obligation to issue the Fours and by releasing Canadian Pacific from its obligation to guarantee the interest on any Fours except those issued prior to May 22, 1936. The Traffic Agreement Supplement provided that: "All provisions of said traffic agreement of May 27, 1890, which required the South Shore Company to issue and apply bonds under said Mortgage for the purposes stated in said agreement, and any provisions thereof which required the Pacific Company to execute a guaranty of interest upon said bonds, are hereby abrogated and shall be of no further effect, except with respect to such bonds as have heretofore been issued, guaranteed, and applied as aforesaid, and the South Shore Company shall promptly revoke the authority of the Trustee under said Mortgage in excess

of the amount now outstanding thereunder, and shall take appropriate steps to close said Mortgage."

Except for the changes made by this supplement, the Traffic Agreement remains intact. The Agreement of Sale has never been changed. Both South Shore and Canadian Pacific knew South Shore was insolvent when they executed the Traffic Agreement Supplement. When the supplement was executed, only $184,000 of Fives had been retired with Fours pursuant to the provisions of the Traffic Agreement. Consequently, $3,816,000 of Fives remained outstanding. None have been exchanged or retired since then.

On January 2, 1937, when the Fives matured, South Shore was unable to retire them and filed in this court a petition for reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. That reorganization is in process, and the South Shore is still under the jurisdiction of this court.

Plaintiff, who holds seventeen of the Fives, is bringing this action to compel South Shore to exchange his Fives for Fours and to compel the Canadian Pacific to guarantee the interest thereon. Plaintiff's right to maintain such an action against a railroad which is in reorganization under Section 77 of the Bankruptcy Act is assumed, but not decided. Certain interveners have filed complaints in intervention and have joined with plaintiff in seeking the relief above outlined. Neither plaintiff nor the interveners had any actual knowledge of the provisions of the Traffic Agreement until after the execution of the Traffic Agreement Supplement of May 22, 1936. There is no claim of reliance on the part of the plaintiff or of the interveners on the terms of the Traffic Agreement, or on any of the other transactions of July 17, 1890.

Plaintiff seeks to recover principally as a third party beneficiary of both the Traffic Agreement executed by the defendant railroads on July 17, 1890, and the Agreement of Sale which the Duluth, South Shore and Atlantic Railway Company and the Marquette, Houghton & Ontonagon Railroad executed on July 17, 1890. In the alternative, plaintiff seeks to recover as a Duluth, South Shore and Atlantic Railway Company bondholder (creditor) who has been injured by the modification of the Traffic Agreement and the South Shore's failure to assert affirmatively its rights under the Traffic Agreement. Specifically, plaintiff seeks to compel South Shore to retire his Fives by exchanging them for Fours, pursuant to the Traffic Agreement provisions, and to compel Canadian Pacific to guarantee interest thereon. If that relief is denied, then plaintiff requests damages from the Canadian Pacific.

The contracts in the instant case were made and were performed in New York. In Thomson-Houston Electric Co. v. Palmer, 1893, 52 Minn. 174, 53 N.W. 1137, 38 Am.St.Rep. 536, Justice Mitchell held that the performance of a contract was governed by the laws of the State in which it was to be performed. The language and reasoning of this case also commit Minnesota to the majority rule that the existence of a contract is governed by the laws of the State in which it was made. Klaxon Co. v. Stentor Elec. Mfg. Co., 1940, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477, holds that the doctrine of Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, applies to conflict of laws. Consequently, this court must apply the conflict of laws rules which are applied by the State of Minnesota. It follows, therefore, that the law of New York governs all questions in the instant case unless otherwise indicated.

### I.

The first question which presents itself is whether the Traffic Agreement, the Agreement of Sale, and the Mortgage of 1890 should be read and interpreted together. The New York courts recognize that, if several instruments are executed contemporaneously and pertain to the same transaction, they can be read together. Nau v. Vulcan Const. Co., 1941, 286 N.Y. 188, 197, 36 N.E.2d 106; Town of Mt. Morris v. Thomas, 1899, 158 N.Y. 450, 53 N.E. 214; In re Estate of Campbell, 1937, 164 Misc. 640, 299 N.Y.S. 451. While it is asserted that a fair construction of the pleadings suggests an admission on the part of the defendant Canadian Pacific that these three instruments were executed contemporaneously as a part of one plan, the position of the plaintiff in this regard should be sustained from the pertinent facts and circumstances. The fact that the Traffic Agreement bears the date of May 27, 1890, whereas the other

two instruments bear the date of July 17, 1890, does not destroy the rule announced by the New York courts. Although Mott v. Richtmeyer, 1874, 57 N.Y. 49, 64, held that the instruments could not be construed together unless they were executed on the same day, Baird v. Erie R. Co., 1914, 210 N.Y. 225, 104 N.E. 614, clearly limited that case to its facts. New York now expressly recognizes that the instruments need not be executed on the same day in order to be construed together as part of the same transaction. The main question seems to be whether they were executed as part of the same transaction. Nau v. Vulcan Const. Co., 1941, 286 N. Y. 188, 197, 36 N.E.2d 106; Knowles v. Toone, 96 N.Y. 534. See also Strobe v. Netherland Co., 1935, 245 App.Div. 573, 283 N.Y.S. 246.

■ There seems little doubt that each of the instruments was executed as part of one entire transaction. Each was made for the general purpose of stabilizing South Shore's financial position. Each instrument also recognized the existence of the other. The Mortgage of 1890 expressly refers to the Traffic Agreement in Recital 29 and in Section 1. It expressly refers to the Agreement of Sale in Recital 22. The Agreement of Sale expressly refers to the Mortgage of 1890 and the Traffic Agreement in its last three recitals and in Recital 14 respectively. The Traffic Agreement refers to the contemplated Mortgage of 1890 in the third Article, and although it does not specifically refer to the Agreement of Sale, it clearly contemplates its existence in that the provisions for exchanging Fours for Marquette bonds cannot be carried out unless there exist greater rights than those under the perpetual lease which the Traffic Agreement recognizes. Likewise, all the instruments must be read together, it seems, to obtain a clear understanding of the real provisions and the meaning of each of them. The execution of the Mortgage of 1890 and the Agreement of Sale seems necessary to enable the plan in the Traffic Agreement to be carried out. This agreement contemplates the issuance of bonds and the guaranteeing of interest thereon. The Mortgage of 1890, not the Traffic Agreement, provides for the carrying out of this provision and the issuance of the bonds. Furthermore, South Shore really cannot agree that Marquette will be bound to certain things or agree to exchange the Fours for Marquette bonds as it does in the Traffic Agreement unless it has the power to bind Marquette and to carry out its promises. Neither the Traffic Agreement nor the perpetual lease, to which the former refers, gives South Shore that power. But the Agreement of Sale did. Likewise, Canadian Pacific admits in Section 12 of its answer that it knew of and approved the execution of the instruments of July 17, 1890. It further concedes that the Traffic Agreement framed on May 27, 1890, was not executed until July 17, 1890. Under such circumstances, the instruments seem to have been executed contemporaneously as part of one transaction and therefore can and should be, construed together. Knowles v. Toone, supra; Nau v. Vulcan Const. Co., supra; see In re Estate of Campbell, supra, and Alden v. Wright, 1916, 175 App.Div. 692, 162 N.Y.S. 668.

■ Canadian Pacific argues that the rule for which plaintiff contends cannot be applied because the instruments are not between the same parties. It relies upon Craig v. Wells, 1854, 11 N.Y. 315, which expressly holds that instruments executed contemporaneously as part of the same transaction cannot be construed together if they are not between the same parties. But, although this case has never been expressly overruled, it does not appear to have been followed and seems to have been impliedly overruled by the New York Court of Appeals in Nau v. Vulcan Const. Co., 1941, 286 N.Y. 188, 197, 36 N.E.2d 106. See also Alden v. Wright, 1916, 175 App.Div. 692, 698, 162 N.Y.S. 668; Strobe v. Netherland Co., supra; In re Estate of Campbell, supra; Marklove v. Utica, etc., R. R., 1905, 48 Misc. 258, 96 N.Y.S. 795. In these cases, the contracts were between different parties, but the court held that the instruments could be construed together because they were executed contemporaneously as part of the same transaction. Although the court did not mention Craig v. Wells, or expressly state that the contracts could be construed together even though they were not all between the same parties, the rule's application to the given facts seems necessarily to imply that the court no longer agrees with that case.

II.

Is plaintiff a third party beneficiary? A discussion of this question requires a determination of the language and scope

542

of the promises which plaintiff now seeks to enforce; that is, he is seeking to enforce the claimed promises of the South Shore in the Traffic Agreement and the Agreement of Sale to exchange Fives for Fours, and the claimed promise of the Canadian Pacific in the Traffic Agreement to guarantee, upon certain conditions, the interest on the Fours so exchanged.

In determining plaintiff's asserted right herein as a third party beneficiary, it becomes necessary to determine the intent of the parties. Lawrence v. Fox, 1859, 20 N.Y. 268; Wilson v. Oliver Costich Co., 1931, 231 App.Div. 346, 247 N.Y.S. 131, affirmed 256 N.Y. 629, 177 N.E. 169; Fata v. Healy Co., 1943, 263 App.Div. 725, 30 N.Y.S.2d 739. This is true whether plaintiff is a donee or creditor beneficiary, both of which are recognized in New York. Compare Lawrence v. Fox, 1859, 20 N.Y. 268; Wilson v. Oliver Costich Co., 231 App.Div. 346, 247 N.Y.S. 131, affirmed 256 N.Y. 629, 177 N.E. 169. Donee and creditor beneficiaries differ only with respect to the factual situations to which they apply; that is, the donee beneficiary contract embraces the situation in which the relationship between the promisee and beneficiary is that of donor-donee, i. e., the performance received by the beneficiary from the promisor is in the nature of a gift. The creditor beneficiary contract embraces the situation in which the relationship between the promisee and the beneficiary is that of debtor and creditor, i. e., the performance is received by the beneficiary from the promisor in satisfaction of an actual or supposed obligation owed to him by the promisee. See Restatement of Contracts, Section 133.

The real and instant query, therefore, may be stated as follows: Did South Shore and Canadian Pacific intend that the holders of the Fives, as third parties to their contract, should be granted the right to enforce the promises contained therein with reference to the exchange of the Fives for Fours and the guaranty of the interest on the Fours by the Canadian Pacific? If it was intended that plaintiff should have the right to enforce these promises, then he is a third party beneficiary. Fosmire v. Natl Surety Co., 1920, 229 N.Y. 44, 127 N.E. 472; Graybar Electric Co. v. Seaboard Surety Co., 1935, 157 Misc. 275, 283 N.Y.S. 522. To ascertain such intention, however, the courts look primarily to the intent of the promisee. See Fosmire v. Natl Surety Co., supra; Graybar Electric Co. v. Seaboard Surety Co., supra. We, of course, must look to the situation as it existed at the time that these contracts were executed.

South Shore was financially unstable when the agreement was made. Canadian Pacific had loaned South Shore money to prevent the loss of the lease on the Marquette property, and the South Shore railroad venture had not been a profitable one for at least several years. The purpose of the Traffic Agreement, as claimed by Canadian Pacific and assumed by plaintiff, was to stabilize the South Shore finances. But this purpose could not be accomplished without the cooperation of the holders of the Fives. These bonds were not callable and not due until 1937. They could be retired and obtained only at the pleasure of the holders. Therefore, the holders of the Fives were really the moving parties to the exchange of Fives for Fours, and without their cooperation the Fives could not be exchanged for Fours and the readjustment of South Shore's finances, which was the purpose of the Traffic Agreement, could not be completely attained. The New York courts have looked to whether the third party was the real moving party in the transaction in determining if an intent to benefit existed. See Mott v. New York Security & Trust Co., 1899, 29 Misc. 39, 60 N.Y.S. 357, affirmed 52 App.Div. 623, 65 N.Y.S. 190. Under these circumstances, it seems that the promisees intended to benefit the holders of Fives and that the promisors be obligated to perform at their instance.

The Canadian Pacific, however, urges that the Traffic Agreement was merely entered into for the mutual benefit of the parties thereto. Granted that the instrument as a whole may be characterized as one designed for the benefit of the contracting parties, that fact, however, does not negative the contention that some of its provisions were necessarily made for the benefit of third parties. The existence of a third party beneficiary is not prevented because the performance of the contract will materially benefit both of the parties thereto as well as the third party.

Plaintiff urges that the fact that the perpetual lease was cancelled

almost immediately before the Traffic Agreement and the Agreement of Sale were executed is of particular significance in determining the rights of the holders of Fives as third party beneficiaries. It is pointed out that Marquette and South Shore were express parties to the termination of the lease, and that Canadian Pacific knew of the rescission because it caused the termination by the voting of a majority of South Shore stock which it held in favor of such rescission. It is asserted, therefore, that the cancellation of this lease prompted the parties to grant to the holders of the Fives the right of exchange and the guaranty in order to allay any complaints or proceedings by reason of the abrogation of the lease. The execution of this lease by Marquette was probably invalid as an ultra vires act in absence of any Michigan statute authorizing it. Ackerman v. Cincinnati, S. & M. R. Co., 1906, 143 Mich. 58, 106 N.W. 558, 114 Am.St.Rep. 640, 8 Ann.Cas. 118. The lease was executed and was to be performed in Michigan, and hence the law of that State controls. However, subsequent to its execution, the Michigan statutes authorized a conveyance of railroad property if the owners of a majority of the stock of the vendor corporation consented. Howell's Statutes of Michigan, Supp. of 1883–1889, Sec. 3405a. Such consent seems present herein with respect to the perpetual lease. Marquette accepted $700,000 in rent during the eighteen months between the passage of the statute and the rescission of the lease, and its stockholders voiced no objections to the lease during that time or prior thereto. The operation of a railroad in accordance with the terms of an agreement subsequent to the time when the power to make the agreement was created, has been held to be an adoption of the lease which would otherwise be void as an ultra vires act. Terre Haute & I. R. Co. v. Cox, 7 Cir., 1900, 102 F. 825. See, also, Adelman v. Carson, Pirie Scott & Co., 1928, 247 Ill.App. 574. But whatever equity the Fives had in the perpetual lease, it probably was of doubtful value. It must be recognized that the lease was an onerous one to the South Shore. The Marquette bonds of some $1,380,500, which matured in 1892, were prior to the mortgage lien of the Fives. The burden of the lease was undoubtedly one of the factors which induced the plan to obtain a deed to the Marquette properties and the proposed absorption of the liens thereon by the issuance of the Fours, which were to become a lien on the entire South Shore properties. The cancellation of the lease was one of the steps taken to consummate the contemplated consolidation of the entire indebtedness on the South Shore system in one mortgage lien; that is, the consolidation of the outstanding indebtedness into one mortgage lien was one of the principal aims of the refinancing program. Moreover, it may be entirely sound to reason that the benefit which was bestowed on the holders of the Fives as beneficiaries was due to the desire of the parties to refinance the entire South Shore structure, and undoubtedly in carrying out that purpose it was intended that some attraction should be held out to the holders of the Fives so that they would make the exchange and thus aid in the purposes which the parties had in mind. Concededly, the Fives would be benefited by the plans which the parties contemplated. With the cancellation of the lease, their lien was relegated to the system's disconnected ends. The Fours would have a lien on the entire system and have the guaranty as to the payment of interest by the solvent Canadian Pacific. The interest to which the holders of the Fives were entitled was guaranteed by no one. Since the parties must have intended the direct results of their promises and acts, they must be presumed to intend this actual benefit to the Fives. This intention fairly appears from all the circumstances, but the cancellation of the perpetual lease was only one of the incidents which spells out such intention. There is an absence of any satisfactory showing which would justify the belief that the parties intended to make the holders of the Fives third party beneficiaries primarily because of the cancellation of the perpetual lease. The burdens of the lease and the mounting indebtedness confronting the South Shore in endeavoring to comply with its terms, rendered the lien of the Fives of but doubtful value. In view of these circumstances, it is indeed dubious that the Canadian Pacific and the South Shore were greatly concerned about the attitude of the holders of the Fives by reason of this cancellation; at least, there is no evidence to indicate it one way or another. In any event, the holders of the Fives were afforded the opportunity to obtain the new Fours with the guaranty, or to retain the Fives with the higher rate of

interest but with the decreased security on account of the cancellation. Presumably, the holders of the Fives, on account of the cancellation of the lease, might have instituted foreclosure proceedings by reason of an alleged breach of the covenants of the mortgage, but this they never did. In so far as this present proceeding is concerned, it would seem that the only importance of the cancellation is that it constituted one of the steps which was taken in order to consummate the financing program promulgated by the parties, and in that connection it does have a bearing upon the intention of the parties to create a third party beneficiary.

### III.

While it seems, therefore, reasonably clear that the factual situation will require a finding that the holders of the Fives were intended to be third party beneficiaries to the contract entered into in 1890, the controlling question is presented in the determination of plaintiff's present rights under the contract or contracts made some fifty years ago. Plaintiff contends that "at" does not mean "eo instanti", and that since Article Fourth of the Traffic Agreement provided that South Shore and Canadian Pacific should fulfill their respective promises "at or before maturity" of the Fives, their holders had a reasonable time after maturity in which to enforce their rights as third party beneficiaries. Assuming that there is substance to this argument, plaintiff's right of recovery herein is met by the question: Did the Traffic Agreement Supplement rescind the Traffic Agreement so as to destroy plaintiff's rights under it? And, if this question is answered negatively: Has plaintiff exercised his rights within a reasonable time after the Fives matured? These questions will be discussed in the order noted.

Plaintiff urges that the rescission cannot destroy his rights if he is a creditor beneficiary, because South Shore was insolvent when the rescission was made, and therefore the rescission was a fraud upon him as a creditor beneficiary. See Restatement of Contracts, Section 143. The rule indicated in the Restatement is not supported by any New York decision. In fact, the majority of the courts hold that a third party donee or creditor beneficiary contract may be rescinded at any time prior to the time when the bene-

ficiary acts in reliance on the contract. Professor Williston classifies New York with the majority. See 2 Williston on Contracts, Section 396 B, n. 2, in which he cites Gifford v. Corrigan, 1889, 117 N.Y. 257, 22 N.E. 756, 6 L.R.A. 610, 15 Am. St.Rep. 508, and Garnsey v. Rogers, 47 N.Y. 233, 7 Am.Rep. 440. However, even though the rule relied upon by plaintiff was applicable, it cannot aid him herein; first, because plaintiff is not a creditor beneficiary, and second, because at least no fraud existed in the release of South Shore's obligation to exchange Fours for Fives. As before stated, a creditor beneficiary contract exists where the performance of the promisor's promise will satisfy the promisee's actual or supposed obligation to a third party. Lawrence v. Fox, supra; Seaver v. Ransom, 224 N.Y. 233, 120 N.E. 639, 2 A.L.R. 1187; Restatement of Contracts, Section 133. The Canadian Pacific, the promisee of South Shore's promise, owed neither the duty to make the exchange nor any other legal duty to the holders of the Fives which South Shore might assume to satisfy by its performance of its promise to exchange. Likewise, Canadian Pacific assumed no obligation of South Shore when it promised as promisor to guarantee the interest on the Fours to those who would exchange their Fives for Fours. Even though it be assumed that some damage resulted to the holders of the Fives when the perpetual lease was cancelled, any right accruing to the holders of the Fives could not form any basis for their alleged position as creditor beneficiaries as distinguished from donee beneficiaries, at least under the circumstances herein. Nor can plaintiff obtain any standing as a creditor beneficiary arising from South Shore's obligation under the Agreement of Sale with Marquette. Obviously, there was no liability or obligation running from Marquette to the holders of the Fives.

Even if plaintiff were a creditor beneficiary, he cannot be sustained in his assertion that the rescission must be invalidated because of fraud perpetrated upon him as a creditor beneficiary. He argues that the fraud existed because an insolvent promisee's release of a solvent promisor is a fraud on the creditor beneficiary even if the promisee acts in absolute good faith. Assuming that this principle is sound, it is not tenable herein. In this connection, it must be remem-

bered that plaintiff necessarily treats the promises of South Shore and Canadian Pacific in the Traffic Agreement as separate promises for the purpose of creating a third party situation. Certainly, the release which the solvent promisee, Canadian Pacific, made to South Shore, when South Shore was released from its obligation to exchange Fours for Fives, could not be a fraud on a creditor beneficiary unless Canadian Pacific so intended. Plaintiff makes no such claim, nor do the facts justify any such contention. Since plaintiff's right to enforce Canadian Pacific's guaranty promise is conditioned upon his being entitled to Fours upon which interest is to be guaranteed, it follows that plaintiff could not enforce Canadian Pacific's promise to guarantee interest in absence of the issuance of the necessary bonds. In other words, if the rescission was valid in so far as the release given to South Shore with reference to the exchange of Fours for Fives was concerned then obviously plaintiff cannot enforce Canadian Pacific's obligation to guarantee interest on bonds which could not be issued.

But plaintiff argues that, in any event, he should be a donee beneficiary and that his rights as a donee beneficiary could not be extinguished without his consent. See Restatement of Contracts, Section 142. While it must be recognized that the Restatement assumes to lay down the broad rule that a third party donee beneficiary contract cannot be rescinded without the donee's consent, this rule is not followed by the majority of the courts. 2 Williston on Contracts, Sec. 396; 13 C.J. 602; 17 C.J.S., Contracts, § 390; note 53, A.L.R. 178. The only condition laid down by the majority of the courts with reference to the rescission of a donee beneficiary contract is that there must be an absence of reliance on the contract by the third party beneficiary.

Although New York does not seem to have considered expressly whether this majority rule, or any other rule, is applicable to donee beneficiary contracts, it has applied the majority rule consistently to creditor beneficiaries. Kelly v. Roberts, 40 N.Y. 432; Moore v. Ryder, 65 N.Y. 438; Simson v. Brown, 68 N.Y. 355; Wheat v. Price, 97 N.Y. 296; Morales v. Joanou, 146 Misc. 515, 262 N.Y.S. 468; see Gifford v. Corrigan, 117 N.Y. 257, 22 N.E. 756, 6 L.R.A. 610, 15 Am.St.Rep.

508; and there seems little doubt that, as Professor Williston concludes, New York also will apply the majority rule to donee beneficiary contracts.

In Gifford v. Corrigan, supra, Justice Finch declared that the rules governing the rescission of a third party beneficiary contract must be framed in the light of the theory upon which they are enforced. New York enforces donee and creditor beneficiary contracts upon the same theory, i. e., intent to benefit the third party by the contract. See Seaver v. Ransom, supra, in which Justice Pound states the rule as applicable to all the classes of third party beneficiaries, including creditor beneficiaries, which are recognized in New York; see, also, Lawrence v. Fox, supra, Graybar Elec. Co. v. Seaboard Surety Co., supra; Wilson v. Costich Co., supra, and Fosmire v. Natl Surety Co., supra. Therefore, since no distinguishing factors which require a different result are apparent, it seems to follow that the majority rule which New York applies to creditor beneficiary contracts must also be applied to donee beneficiary contracts.

The main arguments advanced in favor of the rule advocated by the plaintiff with reference to donee beneficiary contracts are that a beneficiary in a life insurance policy cannot be changed without the consent of the existing beneficiary, and that, where there is a gift, it cannot be revoked without the donee's consent. But it will be seen that neither of these situations is analogous to the donee's rights under a third party beneficiary contract. First, it may be observed that insurance law is peculiar to itself. There has grown up in that field principles of law which are not applicable elsewhere. Public policy and the relationship between the parties largely have influenced the rule with reference to the change of beneficiaries in a life insurance contract. Therein, because of the peculiarity of the law, a beneficiary has a vested interest in absence of the right to change beneficiaries. Nor is the rule regarding revocation of gifts helpful or persuasive in determining the rule as to rescission of a third party beneficiary contract. Where a gift is executed, the donee accepts the gift from the donor and usually possession then rests in the donee. There is the element of delivery and the element of reliance by the donee on that which was

done. In the instant situation, the only so-called gift created was the right of exchange of Fives for Fours which was never relied upon and which was never accepted by the donees prior to rescission. The mere execution of a contract creating third party beneficiary rights does not necessarily create a valid gift to a third party. The contracts are not analogous. Compare Deyo v. Adams, 178 Misc. 859, 36 N.Y.S.2d 734, with Warren v. United States, 1929, 68 Ct.Cl. 634, certiorari denied 1930, 281 U.S. 739, 50 S.Ct. 346, 74 L.Ed. 1154, and Franklin Washington Trust Co. v. Beltram, 1943, 133 N.J.Eq. 11, 29 A.2d 854. In any event, New York enforces third party beneficiary contracts because it is "just and practical" to do so (Seaver v. Ransom, supra [224 N.Y. 233, 120 N.E. 640, 2 A.L.R. 1187])—not because of any technical rules of legalism. Consequently, analogies to insurance and property law seem to be of little help. That the majority rule satisfies the equitable principles of the theory adopted by New York courts and is entirely practical seems free from doubt. No one has suggested any cogent reason why the rights of a donee beneficiary should be any more sacrosanct than the rights of a creditor beneficiary, and there is nothing to indicate that the New York courts would make any distinction in their rights when a rescission has taken place.

Again, it may be emphasized that no actual fraud or bad faith is charged against the Canadian Pacific in releasing South Shore from its obligation to exchange Fours for Fives. Nor is it contended that Canadian Pacific dominated South Shore in entering into the Traffic Agreement Supplement by reason of any stock control. In so far as the present record is concerned, both parties to the agreement did that which they thought was just and proper under the circumstances. The purpose of the Traffic Agreement was to stabilize South Shore financially. Consolidation of all bonds in one issue, as contemplated by the parties in 1890, was no longer possible. Only a relatively small per cent of the outstanding Fives had interested themselves in making the exchange. The holders of the Fives had been content to hold their securities and to collect the higher rate of interest afforded to them. It is quite apparent that the program of refinancing, as envisaged by the parties in 1890, had not materialized. Some forty-six years had elapsed since the Fives were afforded the opportunity to exercise their rights as third party beneficiaries. Although several investment manuals indicated that South Shore's Fives could be retired with Fours, the holders of over $3,000,000 of Fives took no steps to consummate the offer which had remained open all these years. In the meantime, South Shore had become insolvent. Bankruptcy or receivership was inevitable. It was under these circumstances that the Traffic Agreement Supplement was entered into. Certainly, no one would suggest that, in the first instance, the parties to the Traffic Agreement could not have limited the time for exchange of Fives for Fours to any particular number of years. For instance, the time of exchange could have been limited to the year 1936. In absence of reliance by the holders of the Fives on the time period expressed in the contract, it must follow that the parties could do that which they could have done in the first instance. In passing, it may be noted that the holders of the Fives must be charged with constructive knowledge, at least of the fact that some forty-six years ago their lien on the perpetual lease on the Marquette properties was abrogated. Whatever equities may have inured to them by reason of such cancellation has already been referred to in discussing the creation of their rights as third party beneficiaries. But equities existing forty-six years ago do not suggest that such rights continue notwithstanding the changed circumstances which came into existence after the lapse of the years. In passing, therefore, upon the legality of the rescission, the equities existing at that time are the ones which must be considered. Laches and changed circumstances have largely dissipated any equities inuring to the holders of the Fives in so far as such factors may be important in considering the validity of the rescission.

But even assuming that the Traffic Agreement Supplement did not rescind the Traffic Agreement, and that the phrase "at or before maturity" was intended to give the holders of the Fives a reasonable time after the date of maturity in which to exercise their rights as third party beneficiaries, that reasonable time had expired before plaintiff sought to enforce his rights herein. What constitutes a reasonable time depends upon the facts of each

case. The Fives matured on January 1, 1937. South Shore filed its petition under Section 77 of the Bankruptcy Act on January 2, 1937. It was required to proceed with reorganization under its debt structure as it existed on that date. No further securities could be issued except those authorized as a part of reorganization. The claim made by plaintiff herein was not asserted until some years thereafter. He waited until after bankruptcy intervened before he sought to enforce his rights under the agreements which he now seeks to resuscitate. As before stated, the primary purpose of the Traffic Agreement was to stabilize South Shore financially. The parties must have intended that the reasonable time should only extend for such time as was required to accomplish the purposes of the agreement. If such purposes were capable of achievement, then the reasonable time might extend for an appreciable period after the date of maturity. However, at the maturity of the Fives, it was patent that the purposes were no longer possible of achievement. Creditor rights became fixed when South Shore filed its petition for reorganization. There were some $15,000,000 of outstanding Fours. South Shore had disabled itself to exchange Fours for Fives. The various mortgage liens had become fixed. Under these circumstances, it must be evident that any reasonable time which might under other conditions enlarge the phrase "at or before maturity" had expired long prior to the commencement of this suit. The fact that plaintiff may not have been aware of his rights as a third party beneficiary until after bankruptcy intervened cannot amplify the reasonable time. Neither plaintiff nor any of the other present holders of Fives contend that they bought the Fives believing that they could exchange them for Fours. There is an absence of any reliance on the right of exchange or the guaranty.

IV.

As an alternative, plaintiff asserts that, if his rights as a third party beneficiary cannot be enforced under the present circumstances, then he has certain rights as a creditor because South Shore, when insolvent, released a valuable asset when it entered into the Traffic Agreement Supplement of 1936. However, it must be clear that South Shore's assets have not been depleted by reason of the release of Canadian Pacific's obligation to guarantee the Fours. Any performance of this guaranty would neither diminish the debts nor increase the assets of South Shore. Any amount paid by the Canadian Pacific on this guaranty would constitute a claim against the assets of South Shore. The only effect would be a substitution of creditors. In fact, in Article Sixth of the Traffic Agreement, South Shore promised to repay the Canadian Pacific any amount of interest paid by it as guarantor, with six per cent interest. Moreover, any rights of South Shore to issue new obligations would not constitute an asset of that company.

It fairly appears that South Shore would have been required to go into bankruptcy even though all of the Fives had been exchanged for the Fours and the interest thereon guaranteed by the Canadian Pacific. In determining, therefore, whether the Traffic Agreement Supplement released any assets of the South Shore, it must be remembered that South Shore at that time was hopelessly insolvent. The financing arrangement promulgated nearly fifty years ago had not prevented such insolvency. It appears that the holders of only $184,000 of Fives had availed themselves of the opportunity to exchange them for Fours. The holders of the balance in the amount of $3,816,000 had been content to keep their securities and to enjoy the higher rate of interest. They had sat by, so to speak, for nearly fifty years and had not availed themselves of the asset which they now contend was dissipated. At the time of the closure of the Fours mortgage, the parties to the Traffic Agreement Supplement recognized that bankruptcy was inevitable and could not be avoided. A realistic consideration of the entire factual situation leaves no doubt as to the untenability of plaintiff's position in urging any rights other than as a third party beneficiary.

It is the court's opinion, therefore, that plaintiff cannot recover on any of the theories advanced.

Findings of fact and conclusions of law in harmony herewith may be presented on five days' notice. An exception is allowed to the plaintiff.