LOBER v. CANADIAN PAC. RY. CO. et al.
No. 13068.

Circuit Court of Appeals, Eighth Circuit.
Nov. 6, 1945.

Writ of Certiorari Denied Jan. 28, 1946.
See 66 S.Ct. 490.

Ralph Royall, of New York City (F. H. Stinchfield and Stinchfield, Mackall, Crounse & Moore, all of Minneapolis, Minn., and Ehrich, Royall, Wheeler & Holland, of New York City, on the brief), for appellant.

Henry S. Mitchell, of Minneapolis, Minn. (Leonard H. Murray, of Minneapolis, Minn., on the brief), for appellee Canadian Pacific Ry. Co.

Before WOODROUGH, JOHNSEN, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The question on this appeal is whether the claim of appellant as a holder of five per cent first mortgage bonds of the Duluth, South Shore & Atlantic Railway Company, now undergoing reorganization under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, is entitled to priority, in any plan for reorganization ultimately approved, over the claim of the Canadian Pacific Railway Company as a holder of four per cent bonds of the debtor issued under a subsequent consolidated mortgage.

The South Shore was organized in the years 1886–1887 by a syndicate, which acquired by purchase the property of the bankrupt Detroit, Mackinac & Marquette Railway Company and a majority of the preferred and common stock of the Marquette, Houghton & Ontonagon Railroad Company, hereinafter called the Marquette. South Shore and Marquette thereafter were provided with substantially identical boards of directors. In 1887 these boards of directors executed a perpetual lease of the Marquette properties to South Shore, by the terms of which South Shore became obligated to pay six per cent dividends amounting to $196,707 annually on the Marquette preferred stock and $320,672 annual interest on outstanding Marquette bonds in the face amount of $4,903,700. By new construction South Shore extended these railway lines of which it had acquired ownership in one case, and, in the other, the right of possession and operation under a lease.

On April 15, 1887, all the property of South Shore was subjected to a lien of a first mortgage securing an issue of five per cent bonds in the face amount of $4,000,000, payable January 1, 1937. Appellant is now the owner and representative of bonds of this issue of the par value of $157,000. The right of South Shore to possess and operate the Marquette properties was expressly made subject to the lien of the first mortgage five per cent bonds. The Marquette property, however, was subject to the prior lien of its bonds outstanding at the time of the issue of the South Shore Fives.

In 1888 Canadian acquired a majority of South Shore's capital stock, and since that time Canadian has voted this stock in favor of persons who were elected to South Shore's board of directors. At the time Canadian acquired control of South Shore, the latter had incurred a short-term floating debt of $1,200,000, which by July 1890 had increased to $3,733,749, of which $1,764,393 consisted of advances made to South Shore by Canadian, and $878,886 of short-term borrowings used by South Shore to meet its obligations under the lease of the Marquette property. Marquette was confronted with the maturity in 1892 of bonds issued by it in the approximate amount of $1,380,500, and was indebted to South Shore in the sum of $693,652 for improvements on the Marquette properties made by South Shore. Marquette was unable to meet these obligations, since, under its lease of all of its properties to South Shore, its revenue was sufficient only to pay interest on outstanding bonds and dividends to its stockholders. Marquette was thus confronted with possible loss of its properties, and South Shore with the loss of its rights under the Marquette lease.

To meet the situation just stated, South Shore was reorganized on the following basis. By agreement between the parties the perpetual lease of Marquette's properties to South Shore was abrogated. Marquette conveyed all of its properties to South Shore in consideration of South Shore's assumption of all outstanding Marquette bonds; its undertaking to pay Marquette's stockholders in exchange for their shares specified amounts, either in cash or in four per cent bonds of South Shore to be issued under a consolidated mortgage; and its waiver of the claim of $693,652 owing by Marquette to South Shore for improvements on the former's property.

760

Canadian and South Shore entered into an agreement, hereinafter called the Traffic Agreement, which is the basis in this action of appellant's claim of priority of South Shore five per cent bonds, as to all property of South Shore, over the four per cent bonds issued under the consolidated mortgage.

The obvious purpose of the Traffic Agreement was to reduce the fixed expenses of South Shore by a consolidation of its outstanding debt through the issue of not to exceed $20,000,000 of four cent bonds maturing one hundred years from date (July 17, 1890), and secured by a consolidated mortgage of all of South Shore's property, including that acquired from Marquette. In this contract South Shore made the following agreements:

"Third. The South Shore Company will issue the said bonds to the amount of not exceeding Twenty million dollars ($20,-000,000) par value, in the first instance, secured by a mortgage constituting a valid lien upon all the real and personal property of both the South Shore and the Marquette Companies.

"Fourth. The South Shore Company will apply the said bonds to the following purposes, in the following order:

"I. Four million dollars ($4,000,000) par value thereof, to the sole purpose of retiring, at or before maturity, bond for bond, a like amount of first mortgage five per cent. (5%) South Shore bonds.

"II. One million four hundred thousand dollars ($1,400,000) to the sole purpose of retiring, at or before maturity, bond for bond, a like amount of Marquette six per cent. (6%) mortgage bonds, falling due in the year 1925.

"III. So much as may be necessary for that purpose, to retiring the other bonds hereinbefore mentioned, constituting a lien upon the property of the Marquette Company, at or before their maturity.

"IV. So much as may be necessary to paying off its floating debt and extinguishing the consolidated mortgage now existing.

"V. The residue to the improvement and extension of the South Shore Railway, to perfecting its title to the Marquette lines and to any other lines forming part of the Marquette system, and to the improvement and development thereof."

South Shore further agreed to apply all of its available net earnings for the payment of interest on the four per cent bonds and all bonds prior in lien thereto; to create no subsequent lien upon its property by way of mortgage, except such as should expressly be made subject to the conditions of the Traffic Agreement; to permit Canadian to name its chief managing officers in the event South Shore should default in the payment of interest on its mortgage; to adopt a system of bookkeeping conforming in all respects to that of Canadian and to permit the officers of Canadian to inspect its books of account at all times; to neither construct nor be interested in the construction or operation of any railway line in competition with Canadian; as far as legally permissible, to deliver to and interchange with Canadian all freight and passenger traffic to and from points reached by Canadian.

As consideration for the foregoing agreements upon the part of South Shore, Canadian agreed:

"Fifth. If, within six months after the date hereof, the said new four per cent. (4%) bonds, secured by the said new mortgage or deed of trust are executed, to such amount as may be approved by the Pacific Company, and the surrender of all the bonds issued under the old consolidated mortgage, in exchange for the four per cent. (4%) bonds issued under the new mortgage, to an amount equal to the floating debt and interest secured by such old consolidated mortgage bonds, has been fully assured, then, as fast as the said new four per cent. (4%) mortgage bonds are exchanged for any of the said outstanding bonds, or are issued in retirement of the said floating debt, secured as aforesaid, at par, or as fast as such bonds are issued, exchanged or sold upon other terms, with the consent in writing of the Pacific Company, the latter Company will execute a guaranty, under its corporate seal, upon the new bonds so issued, but upon no others, for the payment of interest thereon, during the entire term thereof, at the rate of four per cent. (4%) per annum, payable semiannually, from the time that such bonds are so issued, exchanged or sold."

It is admitted that the requirements of the conditional clause introducing the paragraph quoted above were fully performed.

The mortgage of July 17, 1890, securing South Shore's four per cent bonds contains the following provision:

"The Trustee shall from time to time, upon receiving in exchange therefor an

equal amount, at par value, of any of the outstanding Bonds, aggregating twelve million six hundred and fifty-six thousand ($12,656,000) dollars and issued under the six Mortgages or Deeds of Trust aforesaid and duly countersigned, certify or countersign a further amount of the Bonds secured by this Indenture, not exceeding in all twelve million six hundred and fifty-six thousand dollars ($12,656,000), par value, and shall deliver the same so certified or countersigned to the persons delivering to the Trustee such outstanding Bonds to an equal amount, at the par value thereof."

This mortgage of the South Shore property was expressly made subject to four outstanding prior mortgages of Marquette, securing four separate bond issues of that railroad on its properties, to the South Shore's first mortgage of April 15, 1887, securing its five per cent bonds, and to South Shore's consolidated mortgage of June 1, 1888, which secured an issue of $3,800,000 of bonds pledged to secure South Shore's unfunded debt; and a provision that the lien created by it on Marquette properties should not be subordinated, as to Marquette property, to the lien of the mortgage securing the five per cent bonds, nor to the lien of the consolidated mortgage of June 1, 1888.

Although there is nothing in the Traffic Agreement so providing, the parties to this action have stipulated that Canadian received four per cent bonds of South Shore, secured by the consolidated mortgage, of the par value of $2,000,000 as a further consideration for its guaranty of interest on the four per cent bonds issued by South Shore and devoted to the purpose stipulated in the Traffic Agreement.

The arrangement provided in the Traffic Agreement, if carried out, would have resulted in retiring approximately $12,656,000 of bonds, for the payment of which South Shore was liable, including four Marquette bond issues, South Shore's issue of five per cent bonds, and its bonds issued under the consolidated mortgage of 1888; and for the issue by South Shore of approximately $3,308,000 of four per cent bonds in exchange for the capital stock of Marquette, and of other four per cent bonds in payment of the balance of South Shore's floating debt and for improvement and extensions of South Shore's properties.

The provisions of the Traffic Agreement, however, were never accomplished. Four per cent bonds in principal amount of $15,107,000 were issued. These bonds, together with unpaid interest coupons thereto attached in the sum of $23,090,635 as of February 1, 1939, are now held by Canadian, and constitute the greater part of its claim in the reorganization proceedings. The amount of four per cent bonds held by Canadian, issued by South Shore for each purpose set out in the Traffic Agreement, does not appear in the record. It does appear, however, that $2,399,200 of the original Marquette bonds were acquired by purchase by South Shore, which issued in place of them $2,399,000 of its four per cent bonds. Only $184,000 in par value of South Shore's $4,000,000 issue of five per cent bonds have been retired. These bonds were acquired by Canadian and exchanged for four per cent bonds of the same face value. The owners of the Fives, except as noted, declined to exchange them for Fours.

In 1936 and for many years preceding, South Shore's net railway operating income was far short of the interest on its funded debt which then amounted to over $20,000,-000. South Shore was faced with the maturity on January 1, 1937, of $1,400,000 in outstanding Marquette six per cent bonds, which, instead of being refunded as contemplated in the Traffic Agreement, had been extended as to maturity until the date mentioned; also with the maturity on the same date of $3,816,000 of South Shore's five per cent bonds still outstanding. South Shore was insolvent, and the necessity for a reorganization of its financial structure was apparent. As a step in the preparation for this reorganization, the Traffic Agreement between Canadian and South Shore was abrogated in May 1936 by a contract referred to as the Traffic Agreement Supplement. By this agreement the mortgage under which South Shore's four per cent bonds had been authorized was closed, prohibiting the issue of further bonds for the purposes stated in the Traffic Agreement, and Canadian was released from its obligation to guarantee interest on Fours not issued. On January 2, 1937, South Shore filed its petition for reorganization. This proceeding is still pending. No plan of reorganization has been filed. None of the outstanding South Shore Fives was offered in exchange for Fours before the filing of the petition. The interest on all of them to maturity had been paid when due.

762

Following the institution of the South Shore reorganization proceeding, a bondholders' protective committee was organized for the South Shore five per cent bonds. More than a year after the institution of the bankruptcy proceedings this committee caused to be brought in the court in which the reorganization was pending an action under the style of McCulloch v. Canadian Pac. R. Co., D.C., 53 F.Supp. 534. In this action McCulloch, an owner and holder of South Shore Fives, asserted that the holders of Fives became entitled under the Traffic Agreement, as third party beneficiaries, to have the provisions of that agreement, relative to the exchange of Fives for Fours guaranteed as to interest by Canadian, kept open until the maturity of the Fives on January 1, 1937; and that the Traffic Agreement Supplement constituted a fraud upon the creditors of South Shore. McCulloch sought a decree against Canadian for specific performance of the Traffic Agreement provision for the retirement of Fives by the issue of the Fours; or, in the alternative, a judgment for damages. On June 29, 1943, this case was decided against the plaintiff, and no appeal was taken. Appellant and the holders of Fives represented by him declined to have anything to do with this action, and it is agreed that they are not bound by the judgment in it.

After the judgment in the McCulloch case, the bondholders' committee, having been permitted to intervene in the reorganization proceedings, instituted an action in the bankruptcy court for an inquiry into the entire relationship between Canadian and South Shore from the time Canadian acquired control of South Shore in 1888 until the filing of the reorganization proceedings on January 2, 1937, for the purpose of ascertaining whether there should be a subordination in whole or in part of the claim of Canadian in the reorganization to the claims of the holders of South Shore Fives. In this proceeding, which is still pending in the bankruptcy court, appellant and his associates have so far declined to participate, on the ground that it is an unnecessary waste of time in view of the facts above set out. Instead, appellant brought the present action to establish in any reorganization plan ultimately adopted for South Shore the priority of South Shore Fives over all the Fours held by Canadian on all South Shore's properties, including that part acquired from Mar-

quette, basing his claim solely upon the legal effect of the Traffic Agreement, the insolvency of South Shore at the time of its abrogation, and Canadian's ownership of a majority of South Shore's capital stock, without proof or claim of mismanagement of South Shore by Canadian, or any showing otherwise of inequity in any of Canadian's claims.

The result is that this action does not involve an inquiry into the question of whether Canadian has faithfully met its obligation as a fiduciary imposed upon it by its ownership of the majority of the capital stock of South Shore throughout the years of its alleged management and control of South Shore. The questions which arise in such an inquiry are all before the bankruptcy court in the proceeding instituted by the bondholders' protective committee, and have been expressly reserved by the bankruptcy court for decision in that proceeding. There is, therefore, no room in the present action for application of the rules laid down in Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Prudence Realization Corporation v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L.Ed. 1293. Obviously, the factors controlling decision in the suit of the bondholders' committee are here left entirely to speculation. The cases cited do not sustain the holding that stock control of one corporation by another, without more, requires that every claim of the controlling corporation against the controlled must be subordinated to those of creditors of the controlled corporation. "A corporation is not liable for the acts or the obligations of another corporation, merely because it controls such other by reason of ownership of its stock." Majestic Co. v. Orpheum Circuit, 8 Cir., 21 F.2d 720, 724; see also Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 487.

In final analysis the issue in this action is whether, on the facts established in this record, the owners of South Shore Fives acquired by the Traffic Agreement an indefeasible right as against Canadian to exchange their bonds, at or before maturity, for bonds guaranteed as to interest by Canadian. Appellant says that the owners of South Shore Fives were third party beneficiaries of the Traffic Agreement, of some undefined category, and as such be-

came vested with the asserted right of exchange. Appellant's position is that by the Traffic Agreement South Shore became obligated to Canadian to retire five per cent bonds by one method only, this is, by the exchange of Fours guaranteed as to interest by Canadian for the outstanding Fives, bond for bond; and that, as a consideration for this obligation on the part of South Shore, Canadian was bound to endorse upon all bonds exchanged for Fives, at or before maturity of the Fives, its guaranty of interest. The answer to this argument is that, conceding that the owners of South Shore Fives acquired the asserted right of exchange, the fact remains that they declined to make it. Instead, they refused to accept the right which they say was granted them in 1890, and persisted in that refusal for more than 47 years, until after the right, as they define and limit it, had expired. The parties agree that the issue here is controlled by New York law. The New York cases dealing with facts essentially the same as the facts established in this record are squarely against appellant's contention. Mott v. New York Security & Trust Co., 29 Misc. 39, 60 N.Y.S. 357; Id., 52 App.Div. 623, 65 N.Y.S. 190; Morse v. Chicago & E. I. R. Co., 84 App.Div. 406, 82 N. Y.S. 698. See also New York Security & Trust Co. v. Louisville E. & St. L. C. R., C.C.Ind., 97 F. 226, cited in Morse v. Chicago & E. I. R. Co., supra.

■ Moreover, we think appellant has misinterpreted the Traffic Agreement. South Shore's agreement with respect to its outstanding Fives was to apply "Four million dollars par value" of its proposed issue of four per cent bonds to the "purpose of retiring, at or before maturity, bond for bond, a like amount of first mortgage five per cent (5%) South Shore bonds." Clearly, South Shore could have performed this agreement either by selling four per cent bonds at the price for which it could purchase an equal amount of five per cent bonds; or by exchanging Fours for Fives, bond for bond. But, accepting for the purpose of the argument appellant's contention that South Shore was obligated under the Traffic Agreement to retire the outstanding

five per cent bonds by exchanging for them Fours of equal face value, the ability of South Shore to perform its obligation was dependent entirely upon factors beyond the control of either party to the agreement, a fact which must have been recognized by both parties at the time the agreement was made. Canadian's obligation to guarantee interest upon South Shore's Fours was, therefore, contingent upon the ability of South Shore to make the proposed exchange of bonds. "* * * if a promise is in terms conditional, no one can acquire any rights under it unless the condition happens or is performed * * *." 2 Williston on Contracts, § 364A, p. 1064, citing McGowin v. Menken, 223 N.Y. 509, 119 N.E. 877, 5 A.L.R. 794; Alexander v. Equitable Life Assur. Society, 233 N.Y. 300, 306, 135 N.E. 509. On appellant's interpretation of the Traffic Agreement Canadian never became bound to South Shore or to any beneficiary of the contract to endorse its guaranty of interest upon Fours until exchanged for Fives.

■ In view of what has been said, further consideration of the rights acquired by holders of Fives by virtue of the Traffic Agreement seems wholly unnecessary. If, however, it may be said that the owners of South Shore Fives were donee-beneficiaries of the Traffic Agreement, they were the donees of a mere option which required acceptance by them before binding Canadian. They were not creditor-beneficiaries because at the time of the execution of the Traffic Agreement its performance did not satisfy "an actual or supposed or asserted duty" of South Shore to them, nor a right as against South Shore which, by operation of law, was barred or unenforceable. Restatement of the Law of Contracts, § 133. South Shore was not, before the Traffic Agreement was executed, under an obligation claimed or enforceable by the holders of the Fives, to issue four per cent bonds guaranteed by Canadian as to interest, nor to exchange such bonds when issued for the outstanding Fives.

The judgment of the District Court is affirmed.