In re DULUTH, S. S. & A. RY. CO. et al.
No. 13310.

United States District Court
D. Minnesota, Fourth Division.
July 31, 1948.

640

G. Aaron Youngquist, of Minneapolis, Minn., for debtor.

Reese D. Alsop (of Hunt, Hill & Betts), all of New York City, and P. Newton Todhunter, of Chicago, Ill., for Hattstaedt Committee.

George W. Morgan (of Morgan, Chase, Headley, & Hoshour), all of St. Paul, Minn., for Central Hanover Bank and Trust Co., trustee under the Debtor's First Mortgage.

E. P. Chapman (of Stinchfield, Mackall, Crounse and Moore), all of Minneapolis, Minn., for Clinkunbroomer Committee.

Henry S. Mitchell and Leonard H. Murray, both of Minneapolis, Minn., for Canadian Pac. Ry. Co.

P. L. Solether, of Minneapolis, Minn., trustee of the debtor, pro se.

NORDBYE, District Judge.

On June 19, 1947, the Interstate Commerce Commission approved and thereupon certified to this Court for its approval or disapproval a Plan of Reorganization for the principal Debtor, The Duluth, South Shore & Atlantic Railway Company (which will be referred to herein as the Debtor), and the subsidiary Debtor, Mineral Range Railroad Company. The Court then entered and caused to be duly served and published an order fixing the time within which objections to the Plan might be filed. No objections were filed.

In the meantime, petitions for the allowance of fees for services rendered and expenses incurred down to September 30, 1947, by counsel, trustees and committees representing parties to this proceeding in the aggregate amount of $354,787 were filed in this Court. These petitions were referred to the Interstate Commerce Commission to fix the maximum amounts allowable. Pending such action by the Commission the Court deferred its consideration of the Plan. On May 18, 1948, the Commission entered its order fixing the maximum amounts of fees and expenses to September 30, 1947, at an aggregate of $199,581. Thereupon the Court entered an order for a hearing on June 21, 1948, on the question whether the Court should approve the Plan of Reorganization approved by the Commission. Due notice of the hearing was given.

At the hearing the Court had before it a certified copy of the record made before the Interstate Commerce Commission, including a transcript of the evidence submitted at the hearing on plans before an Examiner of the Commission, a copy of the Commission's report and order approving the Plan certified to the Court, a transcript of the evidence submitted at the hearing before the Commission's Examiner on the various petitions for fees and allowances, and a copy of the Commission's report and order of May 18, 1948, fixing the maximum amounts allowable on such petitions.

The Debtor's counsel moved that the Court approve the Plan approved by the

Commission, and made an extended statement respecting the factual background of the Plan and its provisions. The Court's attention was directed to a stipulation dated July 28, 1947, executed by counsel for the Hattstaedt and Clinkunbroomer Committees and counsel for the Canadian Pacific and filed by them with the Commission, wherein they agreed to support the Plan approved by the Commission. Counsel for both the Hattstaedt and Clinkunbroomer Committees joined in the Debtor's motion that the Court approve this Plan; counsel for the Hattstaedt Committee made an extended statement in support of the motion, and all other counsel present requested that the Plan be approved.

In brief outline, the essential facts and considerations which lead the Court to approve the Plan are as follows:

The Debtor operates lines of railroad extending from Sault Ste. Marie, Michigan, and from St. Ignace, Michigan, westward to Soo Junction, Michigan, where they join, thence westward through Marquette, Michigan, to Nestoria, Michigan, thence northward from Nestoria to Houghton, Michigan, and westward from Nestoria to Marengo, Wisconsin, thence westward through Ashland, Wisconsin, and Superior, Wisconsin, to Duluth, Minnesota, comprising 425 miles of main line, 21 miles of branch line, and 102 miles of leased line, a total of approximately 548 miles. The cost of reproduction of the principal Debtor's property less depreciation plus value of land and rights amounted to $15,717,941, as of December 31, 1944, according to the report or the Interstate Commerce Commission's Bureau of Valuations.

The portion of the lines extending from Marquette through Nestoria to Houghton was formerly owned and operated by the Marquette, Houghton & Ontonagon Railroad Company, and is known as MH&O Mortgage District. The remaining portions of the Debtor's railroad, extending westward from Nestoria and eastward from Marquette, are collectively known as the DSS&A Mortgage District.

The Debtor also operates in connection with the above railroads, the railroad of the Mineral Range, 26 miles long, extending from Houghton, Michigan, through Hancock to Calumet, Michigan. The cost of reproduction of the Mineral Range railroad, less depreciation plus value of land and rights, was $797,917 as of December 31, 1944, according to the report of the Commission's Bureau of Valuations. This railroad has value principally as a feeder to the Debtor's lines.

On January 2, 1937, the Debtor began this proceeding by filing in this Court a petition showing that it was unable to meet its debts as they matured, and that it desired to effect a Plan of Reorganization pursuant to Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The Debtor's obligations at that time included, in addition to large amounts of unsecured debt, the following amounts of debt secured by outstanding mortgages of its properties:

| | |
|---|---:|
| Bonds secured by the MH&O 6% Mortgage of 1885 (hereafter called Sixes) assumed by the principal Debtor.... | $ 1,400,000 |
| Bonds secured by the DSS&A 5% First Mortgage of 1887 (hereafter called Fives).... | 4,000,000 |
| Bonds secured by the DSS&A Consolidated Mortgage of 1890 (hereafter called Fours) | 15,107,000 |
| Unpaid interest on Fours.... | 21,599,315 |
| Total ................... | $42,106,315 |

On January 30, 1937, the Court appointed two trustees in bankruptcy: Mr. James L. Homire, who was nominated by counsel for the Prudential Insurance Company which owned $416,000 of the Fives, and Mr. E. A. Whitman, who was nominated by counsel for the Canadian Pacific Railway Company. Mr. Homire has since resigned, and Mr. Whitman is deceased. Mr. P. L. Solether is now the sole trustee.

On June 1, 1937, the Mineral Range filed in this Court a petition showing that it was unable to meet its debts as they matured, and praying that it be allowed to effect a Plan of Reorganization in connection with the Plan to be effected for the Debtor. The outstanding obligations of the Mineral Range at that time included, in addition to large amounts of unsecured

debt and equipment trust obligations, $1,-598,675 of principal and $231,912 of unpaid interest owing on bonds secured by mortgages of its properties.

Persons other than the Canadian Pacific held $3,199,000 of the Debtor's Fives; an individual bondholder held $4,000 (reduced to $2,800 by subsequent payment) of Mineral Range bonds; and the Canadian Pacific owned directly or indirectly all of the other outstanding bonds of both the Debtor and the Mineral Range.

The Canadian Pacific conceded from the outset that the Fives were secured by a first lien on the Debtor's properties comprised in the DSS&A Mortgage District and on a proportionate share of the equipment. It claimed, however, that the $1,-400,000 of MH&O Sixes which it owned were secured by a first lien on the properties in the MH&O District plus a proportionate share of the equipment because they were secured by a mortgage placed on those properties in 1885 by the then owner before they were transferred to the Debtor, and that the mortgage securing the $15,107,000 of Fours owned by the Canadian Pacific constituted a second lien on the properties in the MH&O District because that mortgage was placed on those properties by the MH&O Railroad Company contemporaneously with its conveyance of those properties to the Debtor in 1890, and also because it was executed as a purchase money mortgage by the Debtor.

Shortly after this proceeding was begun, impounding petitions were filed in behalf of the Canadian Pacific and in behalf of the public holders of Fives, wherein the petitioners asserted rights under their respective mortgages to have the earnings subsequently accruing from the operations of the properties subject to the respective mortgages segregated for the purpose of being paid to the holders of bonds they secured. The Court ordered the trustees in bankruptcy to prepare and file an equitable formula for allocating revenues and expenses between the DSS&A District and the MH&O District. The trustees caused such a formula to be prepared in collaboration with Mr. McGuigan, an engineer for the Prudential Life Insurance Company,

Mr. Liddy, representing the Canadian Pacific, and Mr. S. R. Lewis, head of the Debtor's Traffic Department. This formula, when prepared, was duly filed with the Court on October 9, 1937. (Record Vol. 1, p. 352).

Negotiations undertaken between representatives of the public holders of Fives and of the Canadian Pacific in an effort to reach an agreement on a Plan of Reorganization broke down on April 11, 1939. Thereupon the Court, on April 27, 1939, entered an order for filing claims specifying the liens asserted in behalf of the various bond issues, and for the subsequent filing of objections to such claims. (Vol. II, p. 840).

On April 29, 1939, a protective committee for holders of Fives, known as the Hattstaedt Committee, which had been authorized by the Interstate Commerce Commission to solicit authorizations to represent holders of Fives, obtained an order from this Court allowing it to intervene in this proceeding.

The Hattstaedt Committee proceeded in due course to object to the Canadian Pacific claims that the MH&O Sixes and DSS&A Consolidated Fours held by that Company were entitled to a first and second lien respectively on the properties in the MH&O District, and filed opposing claims in behalf of holders of Fives that the Fives' mortgage had a first lien, not only on the properties in the DSS&A District, but also on properties in the MH&O District. The latter claim was predicated on the the fact that the Fives' mortgage which was executed in 1887 specifically covered the right of the Debtor to operate the MH&O properties under the perpetual lease thereof pursuant to which it was then operating those properties, and that this lease had been canceled without the consent of the holders of Fives in 1890 when the MH&O properties were conveyed in fee to the Debtor. The Hattstaedt Committee also contended that all claims of holders of Fives other than the Canadian Pacific should be satisfied in priority to the satisfaction of any claims of the Canadian Pacific, on the alleged ground that the Canadian Pacific, being the owner of a majority of the Debtor's stock, had

dominated its affairs to the prejudice of the other holders of Fives. The Canadian Pacific filed objections to those claims. The determination of the issues thus framed was deferred by consent of all interested parties pending the decision of the case of McCulloch v. Canadian Pacific Railway Company which was instigated by the Hattstaedt Committee and joined in by many of the holders of Fives as parties plaintiff.

McCulloch was a holder of Fives who based his case against the Canadian Pacific on the fact that the latter had made an agreement with the Debtor in 1890 to the effect that holders of Fives might exchange their Fives for Consolidated Fours on which the Canadian Pacific would endorse its guaranty of the payment of interest until maturity; and that the cancellation of that agreement by mutual consent in 1936 so far as it applied to any Fives not previously exchanged for guaranteed Fours wrongfully deprived them of their rights. He prayed that the Court either enter a decree of specific performance compelling the Canadian Pacific and the principal Debtor to make the exchanges and guarantees, or enter a money judgment in favor of holders of Fives against the Canadian Pacific for damages sustained by reason of the latter's refusal to do so.

The McCulloch suit was tried by this Court, though not in the bankruptcy proceeding. The evidence was submitted in the form of an elaborate stipulation of facts covering the period from 1887, when the Debtor was organized and began operations, down to 1937 when the present proceeding was begun. Comprehensive briefs were submitted and extended oral arguments made. After careful consideration of the facts and arguments, this Court held that the plaintiff's contentions were not well founded and entered a judgment in favor of the defendants on the basis of an opinion filed on June 29, 1943. D.C., 53 F.Supp. 534. There was no appeal.

The Hattstaedt Committee then resumed negotiations with the Canadian Pacific in an effort to agree on a Plan of Reorganization. These negotiations finally resulted in an agreement to support a Plan providing, in addition to proportionate distributions of available cash, for the replacement of the old securities by issues of new securities and the allotment to the holders of Fives of a share of such new securities proportionate to the worth of the DSS&A District as compared with the MH&O District plus an additional amount of the new securities by way of compromising the unlitigated lien and subordination claims. An outline of a plan of that character was submitted in a joint letter dated December 19, 1944, signed by counsel for the Hattstaedt Committee in behalf of the holders of $1,124,000 of Fives and by counsel for Canadian Pacific, addressed to the counsel for the Debtor suggesting that it prepare and submit a plan of that character to the Court and the Commission, if it thought proper to do so. Action on this suggestion was deferred until the conclusion of the proceeding then pending known as the Lober petition, which had previously been instituted in the Bankruptcy Court.

Lober was a holder of Fives who desired to be represented by counsel other than those employed by the Hattstaedt Committee. His counsel, Mr. Royall, took the position that McCulloch misconceived the remedy to which the holders of Fives were entitled by reason of the cancellation of the provisions for exchanging Fives for Fours guaranteed as to interest by the Canadian Pacific and that the facts developed in the McCulloch case entitled the public holders of Fives to have their claims satisfied in full in priority to any and all claims of the Canadian Pacific.

On July 29, 1944, the Court granted Lober's application to intervene; the issues on his contentions were then duly formulated by petition, answer and reply; the questions thus raised were fully argued to this Court on briefs and orally; and the Court held on January 31, 1945, that Lober had not established any right to the priority he sought. In re Duluth, S. S. & A. Ry. Co., D.C., 58 F.Supp. 733. Lober appealed from that decision to the United States Circuit Court of Appeals, which on November 6, 1945, sustained this Court's decision in an opinion that fully reviewed the pertinent facts and enunciated the controlling principles of law. Lober v. Canadian Pac.

Ry. Co., 8 Cir., 151 F.2d 758. Lober's petition to the Supreme Court of the United States for a writ of certiorari was denied. 326 U.S. 797, 66 S.Ct. 490, 90 L.Ed. 485.

The Debtor then proceeded to prepare and file with the Court and the Commission a Plan of Reorganization in substantial conformity with the proposals which had been submitted by the Hattstaedt Committee and the Canadian Pacific. The Commission fixed July 22, 1946, as the date for a hearing on Plans to be conducted by one of the Commission's examiners.

Meanwhile Lober and certain other holders of Fives formed a new committee, known as the Clinkunbroomer Committee, which was authorized by the holders of $538,000 of Fives to represent them. This committee proceeded to prepare a plan which provided that all claims of holders of Fives be satisfied in new first mortgage bonds and cash, in priority to the satisfaction of any claims of the Canadian Pacific. At the hearing on the plans, held before an Examiner on July 22, 23 and 24, 1946, the Debtor's counsel produced extensive evidence to sustain the Debtor's Plan, counsel for the Hattstaedt Committee testified at length in explanation of his Committee's grounds for supporting the Debtor's Plan, and counsel for the Canadian Pacific expressed that company's willingness to accept it. Counsel for the Clinkunbroomer Committee opposed the Debtor's Plan, and contended that its own plan should be approved.

The Examiner made his report and recommended that the Debtor's Plan be approved substantially as filed. The Clinkunbroomer Committee filed exceptions to the report. Briefs were then filed in behalf of the Debtor, the Hattstaedt and Clinkunbroomer Committees and the Canadian Pacific, and oral arguments were made before Division 4 of the Commission on April 11, 1947. On June 19, 1947, the Commission filed a Report and Order wherein it rejected the Clinkunbroomer Committee's Plan, and approved a plan conforming substantially to the Debtor's Plan with certain modifications which will be noted later. This Report and Order are now before the Court for consideration.

In rejecting the Clinkunbroomer Plan the Commission noted (p. 21) that its proposed subordination of all Canadian Pacific claims to the claims of other holders of Fives was based on contentions that the Canadian Pacific had (a) imposed on the Debtor financial arrangements prejudicial to the other holders of Fives and (b) compelled it to neglect the development of bridge traffic (traffic in which it participates as an intermediate carrier) contrary to the best interests of the other holders of Fives.

Referring to the first of those contentions, the Commission enumerated and considered (pp. 28, 29) the specific facts on which it was based, which were as follows: The termination in 1890 of the Debtor's perpetual lease of the MH&O properties coupled with its acquisition of those properties in fee subject to the Fours' mortgage; the Debtor's delivery of $2,-000,000 of Fours to the Canadian Pacific pursuant to the Traffic Agreement of 1890 between the two companies; the method employed in financing an ore dock at Marquette in 1931; and the termination in 1936 of the provisions of the 1890 Traffic Agreement for issuing Fours with interest guaranteed by the Canadian Pacific in exchange for Fives. As the Commission pointed out, those matters (excepting the ore dock transaction) had all been analyzed and considered by the Court in the McCulloch and Lober cases. The Commission concluded, after reviewing the evidence, that, in so far as the Clinkunbroomer Committee's claim for complete priority of the Fives was based on matters disposed of in the McCulloch and Lober cases, it must be overruled, with which conclusion the Court agrees for the reasons previously stated in the opinions filed in those cases.

■ As for the ore dock transaction, it appeared from the evidence at the hearing before the Examiner that the Debtor found it necessary in 1931 to replace an obsolete ore dock at Marquette with a new dock constructed alongside the old one; that the land on which both the old and the new dock were situated was subject to the liens for the MH&O Mortgage of 1885 securing the Sixes, and of the Fours Mortgage

of 1890, and of the Fives Mortgage of 1887; that the land for the new dock was temporarily released from those mortgages to enable it to be subjected to a first lien in favor of a new mortgage for one million dollars used to finance the new dock; that the trustee of the MH&O Mortgage of 1885 had given its release on the understanding that this mortgage would be subsequently reinstated as a first lien subject only to the lien of the new million dollar mortgage. The Clinkunbroomer Committee contended that the Debtor should have bought for cash from the trustee of the 1885 mortgage an unqualified release of the land on which the new dock was situated and should then have subjected this land and the dock to a first lien in favor of the Fives mortgage. The Commission concluded that there was nothing in this transaction entitling holders of Fives to satisfaction in priority to all Canadian Pacific claims. With this conclusion the Court agrees.

█ The Court finds that the Commission properly rejected the Clinkunbroomer Committee's plan for subordinating all Canadian Pacific claims to the satisfaction of the claims of other holders of Fives because the Committee failed to establish any justification for such subordination.

Turning now to the Plan approved by the Commission, it contemplates that all properties of the principal and subsidiary Debtors be vested in the reorganized company, which will then issue $5,000,000 of new 4% contingent interest bonds secured by a first mortgage on all properties of the reorganized company, and $10,500,000 of new capital stock consisting of 210,000 shares of common stock without par value but having a stated value of $50 per share. $500,000 of this stock is to be issued on the basis of the reorganized company's acquisition of the properties of the Mineral Range.

In support of such a capitalization, the Commission's Report referred (p. 17) inter alia, to the evidence establishing the following facts. The Debtor's average net income available for fixed charges as adjusted, for the years 1928 to 1945 (excluding the so-called depression years of 1930 to 1933, inclusive, and the so-called boom years of 1942 to 1945, inclusive) was $312,-468. On the basis of studies made by the officers and staff of the trustees and debtors, it was estimated that net earnings of the future normal year would amount to $312,468. Deducting from the anticipated normal year's net earnings of $312,468, $200,000 of interest on new bonds, federal income taxes at 38% on the remainder, and $25,000 as a sinking fund payment on the new bonds, there would be about $44,-730 available for dividends on the new stock in the future normal year, or about 21 cents per share. On the basis of net earnings equal to those of 1936 or 1941, the income available for dividends on the new stock would amount to over $1 per share. Capitalized at 4%, $312,468 produces $7,811,700 and the 1936 and 1941 earnings produce $15,569,850 and $16,055,400, respectively. The Commission's Bureau of Valuation estimates of cost of reproduction less depreciation plus the value of lands and rights for the two Debtors produce a total of $16,-515,858.

The Court concludes that it should approve the new capitalization as approved by the Commission.

The Commission's Plan proposes (in addition to cash distributions hereafter mentioned) the following divisions of the proposed issues of new bonds and stock as between (a) the $3,199,000 of Fives which were held on the effective date of the Plan, January 1, 1945, by persons other than the Canadian Pacific, and (b) the holder of $4,000 of the subsidiary Debtor's bonds, and (c) the Canadian Pacific as the then owner of $801,000 of Fives and of all other securities of the Debtor and of all other securities of the Mineral Range.

| | Bonds | Stock |
|---|---|---|
| To the holders of $3,199,000 of Fives | $1,919,400 | —— |
| To the holder of $4,000 of Mineral Range Bonds | 2,000 | —— |
| To the Canadian Pacific | 3,078,600 | 10,500,000 |
| Total | $5,000,000 | $10,500,000 |

The foregoing allocations of the new securities conform substantially to the allocations proposed in the Debtor's Plan, with a modification proposed by the Commission.

■ In the Commission's Plan, as had been proposed in the Debtor's Plan, $350,-000 of the new bonds, about 7% of the total issue of $5,000,000, were allocated to the $4,000,000 of Fives having an admitted first lien on the properties in the DSS&A District, because the application of the segregation formula showed that approximately 7% of the Debtor's average annual income available for fixed charges during the test years 1936 to 1941, inclusive, was earned on the DSS&A District, the remaining 93% being earned on the MH&O District. The Court finds that such an allocation of the new bonds as between the mortgage districts on the basis of their normal earning power was proper, in view of the established principle that earning power is the primary criterion for the allocation of new securities in a Section 77 proceeding.

■ The Commission's Plan then allocates enough of the new common stock to the holders of the $4,000,000 of Fives to satisfy in full the claims for the principal amount of the Fives with interest to January 1, 1945, the effective date of the reorganizations, amounting all told to $5,409,-200. Deducting from that amount the above mentioned $350,000 of new bonds, and the proposed cash distribution of $510,-933 referred to later, left $4,548,206 to be filled out in common stock. The Court finds that such an allocation of new common stock to the holders of Fives was proper.

The Commission's Plan then substitutes for the amount of new stock thus allocable to the public holders of $3,199,000 of Fives, $779,448 in new bonds. That is on the basis of $15 per $100 for the new stock and $70 per $100 for the new bonds. The Hattstaedt Committee considered that a substitution of new bonds for new stock on that basis was proper and desirable from the standpoint of holders of Fives, the Canadian Pacific agreed to it, and it was proposed in the Debtor's Plan. This brought the allotment of new bonds to the public holders of Fives up to $1,059,361, or $331 for each $1,000 Five.

■ The Commission's Plan also adopts the proposal of the Debtor's Plan to allocate an additional $540,151 of new bonds to the public holders of Fives (thus giving each of them $500 all told in new bonds for each $1,000 Five) by way of disposing of the previously mentioned contentions which had been formulated by the Hattstaedt Committee to the effect (a) that the Fives' mortgage was entitled to a first lien on the properties in the MH&O District and (b) that the public holders of Fives were entitled to have their claims fully satisfied in priority to all Canadian Pacific claims on the theory that it had dominated the affairs of the Debtor to the prejudice of the public holders of Fives.

Referring to the first of those contentions, counsel for the Hattstaedt Committee conceded at the hearing before the Examiner that it was possible, but not probable, that a prior lien on the MH&O properties in favor of the Fives could be established but that, even if such a right could be established, it would be "of questionable value". (Tr. pp. 337, 342). This alleged right was based on the fact that the Fives' mortgage expressly covered the Debtor's right to operate the MH&O properties under the perpetual lease upon paying an annual rental of over $500,000, and the further fact that in 1890, when the Debtor had found it impossible to continue the payment of such rentals, the lease was canceled without the consent of the holders of Fives, and the MH&O properties were conveyed in fee to the Debtor, subject to the Fours' mortgage which was executed by the MH&O contemporaneously with its conveyance of its properties to the Debtor, as constituting, inter alia, a purchase money mortgage securing the payment of money borrowed to pay the purchase price of the MH&O properties. On those facts, the Hattstaedt Committee had raised the contention that the holders of Fives were entitled to a reinstatement of their lien on the Debtor's right to operate the MH&O under the lease at the rental mentioned above. The Committee's reason for conceding that this contention was of question-

able value was that it is "not possible" to see how any such rent could be paid. (Tr. p. 342).

The contention of prejudicial domination by the Canadian Pacific, in so far as it was predicated on the previously enumerated transactions considered by the Court in the McCulloch and Lober cases, has been disposed of by the decisions in those cases. At the hearing before the Examiner, counsel for the Hattstaedt Committee expressed their views as to the improbability of their being able to establish prejudicial domination in respect of routing of traffic. Mr. Alsop testified that their investigation pointed to a few instances of routing traffic otherwise than in the manner most favorable to the Debtor. (Tr. p. 348). But he explained that mere occasional instances of that character would not be sufficient, that it would be necessary to establish a course of action in the routing of traffic substantially prejudicial to the Debtor, and that, even if evidence to that effect could be discovered, it was his position that it would have to be weighed against the advantages derived by the Debtor from the Canadian Pacific in the form of traffic received from that company and otherwise, and that successful prosecution of the charge of prejudicial domination was "dubious". (Tr. pp. 347–348).

In view of the foregoing evidence and the decisions in the McCulloch and Lober cases, the Court finds that the previously mentioned allocation of $540,151 of the new bonds to dispose of the unlitigated claims as to liens and prejudicial domination is proper as representing an adequate and reasonable allowance by way of compromising such claims. This additional amount of new bonds, added to the previous allocation of $1,059,361, produces $1,599,-512, which is approximately 50% of the $3,-199,000 principal amount of the Fives held by the public.

In addition to the new bonds thus allocated to the public holders of Fives in the Debtor's Plan, the Commission's Plan proposes to allocate $100 more in new bonds for each $1,000 Five held by them, by way of allowing for the possible retention of some of the increase in bridge traffic over the DSS&A District and a consequent increase in that District's contribution to the Debtor's earnings which counsel for the Clinkunbroomer Committee contended was to be anticipated. The Court finds that this modification of the Debtor's Plan is proper.

In addition to the $1,919,400 of new bonds thus allocated to the public holders of Fives, the Commission's Plan adopts the proposal in the Debtor's Plan of allowing $2,000 of the new bonds plus $72 cash to the previously mentioned holder of $4,000 of the Mineral Range bonds.

Under the Commission's Plan, the properties of the Mineral Range are to be conveyed to the reorganized company in consideration of the issue of 10,000 shares of the new stock to the holders of bonds secured by liens on such properties. The pro rata proportion of the owner of the eight bonds would be 56.91 shares of the new stock having a stated value of $50 per share amounting to $2,845, and an estimated market value of $7.50 per share or about $426. It is assumed that this bondholder would prefer to have his claim for principal and unpaid interest to January 1, 1945, which amounts to $5,600 as reduced by a cash payment made in February, 1945, satisfied on the basis of 37% thereof in new bonds, that being the basis on which the claims of holders of Fives would be satisfied according to the Debtor's Plan. 37% of $5,600 is $2,072. The Court finds that the allocation in the Commission's Plan of $2,000 of the new bonds plus $72 cash to this bondholder is a proper disposition of his claim.

The Commission's Plan then allocates to the Canadian Pacific all of the proposed issues of new bonds and stock not allocated as above to other holders of secured claims. The preceding allocations of new securities to such other claimants having been found proper, and the remainder being far less than sufficient to satisfy the secured claims of the Canadian Pacific, it follows that the Commission's allocation of the remainder to that company should be approved. In view of the fact that the claims of the secured creditors cannot be satisfied in full, it is obvious that the unsecured indebted-

ness and the stock of both the Debtor and the Mineral Range are without value, as the Commission has found.

The Plan also proposed a cash distribution of slightly more than $1,000,000 out of the net earnings produced by the two mortgage districts in the years 1937 to 1944, inclusive, which earnings had been impounded for the bondholders respectively entitled thereto, approximately 61% for the MH&O District and 39% for the DSS &A District. The variation in percentages from those of net earnings in the test years is due largely to a very considerable amount of bridge traffic over the DSS&A District during war years. The amount to be distributed to the holders of Fives, including the Canadian Pacific, is $100 per bond or $400,000, and the amount to be distributed to the Canadian Pacific as holder of all other securities is $636,469. In addition to this cash distribution there will also be paid to all holders of Fives $83,649 in proceeds from sales of property subject to the DSS&A mortgage, plus $18,143.92 being the share of the DSS&A District in $29,724.64 of proceeds from sales of equipment. The sum of the last two items represents $25.45 per bond, making a distribution of $125.45 per bond, or aggregates of $401,309 to the public holders of the 3,199 Fives and $100,484 to the Canadian Pacific on account of its 801 Fives.

The Canadian Pacific will receive additional cash represented by $9,200 interest for the year 1937 on 184 Fives then held by it, that year's interest having been previously paid to the public holders of Fives, $636,469 out of impounded earnings, $33,555 from proceeds of sales of fixed mortgaged property in the MH&O District, $11,580 as the MH&O District's proportionate share of the $29,724 proceeds from sales of equipment previously referred to, $868 on deposit for holders of MH&O mortgage notes, and $36,439 in proceeds from sales of mortgaged properties of the Mineral Range, an aggregate of $728,113.

As of April 30, 1948, the Debtor and the Mineral Range had on hand cash and United States Government obligations readily convertible into cash amounting all told, according to the report filed with the Court by the Trustee in Bankruptcy, to $4,171,113. Deducting from that amount reorganization expenses estimated at $375,000, plus a reserve for land grant refunds amounting to $410,787 as of December 31, 1947, plus $625,000 working capital for the reorganized company, or $1,410,787 all told, leaves $2,760,326, which is substantially more than will be required for the payment (in addition to required bond interest payments and sinking fund provisions subsequent to January 1, 1945, the effective date of the Plan) of the total cash disbursements of $1,229,907 proposed in the Commission's Plan, all of which disbursements the Court finds proper.

The Court finds that the rights and equities of any holders of (1) the Debtor's preferred and common stocks and the capital stock of the Mineral Range, (2) claims not secured by the mortgages securing Debtor's 6%, 5% or 4% bonds, and (3) claims not secured by the mortgages securing the Hancock & Calumet Railroad Company's 5% bonds dated January 1, 1891, assumed by the Mineral Range, the Mineral Range 5% and 4% bonds dated December 1, 1890, and the Mineral Range 4% bonds dated January 1, 1901, have no value at this time.

The Court further finds that the following claims against the Debtor or the Mineral Range, to the extent allowed, will not be affected by the Plan: (1) claims arising from the administration of the trust estates and operation of the properties subsequent to the filing of the petition of the Debtor on January 2, 1937, of the Mineral Range on June 1, 1937, respectively; (2) claims against either of the Debtors entitled to priority over one or more of its mortgages, and (3) claims for interest on the Debtor's 5% bonds represented by coupons which matured January 1, 1937, or prior thereto, not paid at maturity because not presented for payment, and that the interests of the holders of such obligations will not be adversely and materially affected by the plan.

The Court finds and concludes that:

1. The plan proposed and approved by the Commission

■ (a) complies with the provisions of subsection b of Section 77 of the Bankruptcy Act; is fair and equitable; affords due

recognition to the rights of each class of creditors and stockholders; does not discriminate unfairly in favor of any class of creditors or stockholders; will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders, and will otherwise meet the requirements of subsection e of Section 77 of the Bankruptcy Act and will be compatible with the public interests, and

(b) provides for the payment of all costs of administration and other allowances made or to be made by the Court.

2. The approximate amounts to be paid by the Debtors, or by any corporation or corporations acquiring the Debtors' assets, for fees and expenses incident to the reorganization, have been fully disclosed so far as they could be ascertained at the date of said hearing, are reasonable, are within the maximum limits fixed by the Commission, and are, within such maximum limits, subject to the approval of the Court.

The Plan of Reorganization of the Debtors approved and certified to this Court by the Interstate Commerce Commission is approved.